ILLINOIS BRICK CO. ᴇᴛ ᴀʟ. *v.* ILLINOIS ᴇᴛ ᴀʟ.

No. 76–404.   Argued March 23, 1977—Decided June 9, 1977

*Edward H. Hatton* argued the cause for petitioners. With him on the briefs were *Lynne E. McNown, Alan L. Metz, Samuel J. Betar, Earl E. Pollack, James P. Morgan, Thomas W. Johnston,* and *George B. Collins.*

*Lee A. Freeman, Jr.,* Special Assistant Attorney General of Illinois, argued the cause for respondents. With him on the brief was *William J. Scott,* Attorney General.

*Assistant Attorney General Baker* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Friedman* and *Carl D. Lawson.\**

*\*Evelle J. Younger,* Attorney General, *Sanford N. Gruskin,* Chief Assistant Attorney General, *Warren J. Abbott,* Assistant Attorney General, and *Michael I. Spiegel* and *Richard N. Light,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* urging affirmance.

A brief of *amici curiae* urging affirmance was filed by the Attorneys General and other officials for their respective States as follows: *Bruce E. Babbitt,* Attorney General, *John A. Baade,* Assistant Attorney General, and *Kenneth R. Reed,* of Arizona; *William J. Baxley,* Attorney General, and *William T. Stephens,* Assistant Attorney General, of Alabama; *Avrum M. Gross,* Attorney General, and *Joseph K. Donohue,* Assistant Attorney General, of Alaska; *Bill Clinton,* Attorney General, and *Frank B. Newell,* Deputy Attorney General, of Arkansas; *J. D. MacFarlane,* Attorney General, and *Robert F. Hill,* First Assistant Attorney General, of Colorado; *Carl R. Ajello,* Attorney General, and *Gerard J. Dowling* and *Larry H. Evans,* Assistant Attorneys General, of Connecticut; *Richard R. Wier, Jr.,* Attorney General, and *Regina M. Small,* Deputy Attorney General, of Delaware; *Robert L. Shevin,* Attorney General, and *Charles R. Ranson,* Assistant Attorney General, of Florida; *Arthur K. Bolton,* Attorney General, and *R. Douglas Lackey,* Assistant Attorney General, of Georgia; *Ronald Y. Amemiya,* Attorney General, and *Nelson S. W. Chang,* Deputy Attorney General, of Hawaii; *Wayne L. Kidwell,* Attorney General, and *Rudolf D. Barchas,* Deputy Attorney General, of Idaho; *Theodore L. Sendak,* Attorney General, and *Donald P. Bogard,* of Indiana; *Richard C. Turner,* Attorney General, and *Gary H. Swanson,*

MR. JUSTICE WHITE delivered the opinion of the Court.

*Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S. 481 (1968), involved an antitrust treble-damages action

Assistant Attorney General, of Iowa.; *Curt T. Schneider,* Attorney General, and *Thomas H. Brill,* Assistant Attorney General, of Kansas; *Robert F. Stephens,* Attorney General, and *W. Patrick Stallard,* Assistant Attorney General, of Kentucky; *William J. Guste, Jr.,* Attorney General, and *John R. Flowers, Jr.,* Assistant Attorney General, of Louisiana; *Joseph E. Brennan,* Attorney General, and *Cheryl Harrington,* Assistant Attorney General, of Maine; *Francis B. Burch,* Attorney General, and *Thomas M. Wilson III,* Assistant Attorney General, of Maryland; *Francis X. Bellotti,* Attorney General, and *Paula W. Gold,* Assistant Attorney General, of Massachusetts; *Frank J. Kelley,* Attorney General, and *Edwin M. Bladen,* Assistant Attorney General, of Michigan; *Warren R. Spannaus,* Attorney General, and *Alan H. Maclin,* Special Assistant Attorney General, of Minnesota; *A. F. Summer,* Attorney General, and *Donald Clark, Jr.,* Special Assistant Attorney General, of Mississippi; *John Ashcroft,* Attorney General of Missouri; *Michael T. Greely,* Attorney General, and *Mike McGrath,* Assistant Attorney General, of Montana; *Paul L. Douglas,* Attorney General, and *Robert F. Bartle,* Assistant Attorney General, of Nebraska; *Robert List,* Attorney General, and *Donald Klasic,* Deputy Attorney General, of Nevada; *David H. Souter,* Attorney General, and *Wilfred John Funk,* Assistant Attorney General, of New Hampshire; *William F. Hyland,* Attorney General, and *Elias Abelson,* of New Jersey; *Toney Anaya,* Attorney General, and *Robert N. Hilgendorf,* Assistant Attorney General, of New Mexico; *Louis J. Lefkowitz,* Attorney General, and *John M. Desiderio,* Assistant Attorney General, of New York; *Rufus L. Edmisten,* Attorney General, and *G. Jona Poe, Jr.,* Special Deputy Attorney General, of North Carolina; *Allen I. Olson,* Attorney General, and *Lynn E. Erickson,* Assistant Attorney General, of North Dakota; *Larry Derryberry,* Attorney General, and *Paul C. Duncan,* Assistant Attorney General, of Oklahoma; *James A. Redden,* Attorney General of Oregon; *Robert P. Kane,* Attorney General, and *Vincent X. Yakowicz,* Solicitor General, of Pennsylvania; *Julius C. Michaelson,* Attorney General of Rhode Island; *Daniel R. McLeod,* Attorney General, and *Victor S. Evans,* Deputy Attorney General, of South Carolina; *William J. Janklow,* Attorney General, and *Thomas J. Welk,* Assistant Attorney General, of South Dakota; *Brooks McLemore,* Attorney General of Tennessee; *John L. Hill,* Attorney General, and *Lee C. Clyburn,* of Texas; *Robert B. Hansen,* Attorney General, and *William T. Evans,* Assistant Attorney General, of Utah; *M. Jerome Diamond,* Attorney General, and *Jay I. Ashman,*

brought under § 4 of the Clayton Act [1] against a manufacturer of shoe machinery by one of its customers, a manufacturer of shoes. In defense, the shoe machinery manufacturer sought to show that the plaintiff had not been injured in its business as required by § 4 because it had passed on the claimed illegal overcharge to those who bought shoes from it. Under the defendant's theory, the illegal overcharge was absorbed by the plaintiff's customers—indirect purchasers of the defendant's shoe machinery—who were the persons actually injured by the antitrust violation.

In *Hanover Shoe* this Court rejected as a matter of law this defense that indirect rather than direct purchasers were the parties injured by the antitrust violation. The Court held that, except in certain limited circumstances,[2] a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and that the antitrust defendant is

---

Assistant Attorney General, of Vermont; *Anthony F. Troy,* Chief Deputy Attorney General, and *John J. Miles,* Assistant Attorney General, of Virginia; *Slade Gorton,* Attorney General, and *Thomas L. Boeder,* Assistant Attorney General, of Washington; *Chauncey H. Browning, Jr.,* Attorney General, and *Gene Hal Williams,* Deputy Attorney General, of West Virginia; *Bronson C. LaFollette,* Attorney General, and *Michael L. Zaleski,* Assistant Attorney General, of Wisconsin; *V. Frank Mendicino,* Attorney General, *Charles J. Carroll,* Deputy Attorney General, and *Jim Gusea,* Assistant Attorney General, of Wyoming.

[1] Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[2] The Court cited, as an example of when a pass-on defense might be permitted, the situation where "an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged . . . ." 392 U. S., at 494. See *infra,* at 735–736.

not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge. 392 U. S., at 494. The first reason for the Court's rejection of this offer of proof was an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge. *Id.*, at 492–493.[3] A second reason for barring the pass-on defense was the Court's concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality"

---

[3] The Court explained the economic uncertainties and complexities involved in proving pass-on as follows:

"A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. On the other hand, it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories." 392 U. S., at 492–493. (Footnote omitted.)

because indirect purchasers "would have only a tiny stake in the lawsuit" and hence little incentive to sue. *Id.*, at 494.

In this case we once again confront the question whether the overcharged direct purchaser should be deemed for purposes of § 4 to have suffered the full injury from the overcharge; but the issue is presented in the context of a suit in which the plaintiff, an indirect purchaser, seeks to show its injury by establishing pass-on by the direct purchaser and in which the antitrust defendants rely on *Hanover Shoe*'s rejection of the pass-on theory. Having decided that in general a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff, we must now decide whether that theory may be used offensively by an indirect purchaser plaintiff against an alleged violator.

## I

Petitioners manufacture and distribute concrete block in the Greater Chicago area. They sell the block primarily to masonry contractors, who submit bids to general contractors for the masonry portions of construction projects. The general contractors in turn submit bids for these projects to customers such as the respondents in this case, the State of Illinois and 700 local governmental entities in the Greater Chicago area, including counties, municipalities, housing authorities, and school districts. See 67 F. R. D. 461, 463 (ND Ill. 1975); App. 16–48. Respondents are thus indirect purchasers of concrete block, which passes through two separate levels in the chain of distribution before reaching respondents. The block is purchased directly from petitioners by masonry contractors and used by them to build masonry structures; those structures are incorporated into entire buildings by general contractors and sold to respondents.

Respondent State of Illinois, on behalf of itself and respondent local governmental entities, brought this antitrust treble-damages action under § 4 of the Clayton Act, alleging that

petitioners had engaged in a combination and conspiracy to fix the prices of concrete block in violation of § 1 of the Sherman Act.[4] The complaint alleged that the amounts paid by respondents for concrete block were more than $3 million higher by reason of this price-fixing conspiracy. The only way in which the antitrust violation alleged could have injured respondents is if all or part of the overcharge was passed on by the masonry and general contractors to respondents, rather than being absorbed at the first two levels of distribution. See *Illinois* v. *Ampress Brick Co.*, 536 F. 2d 1163, 1164 (CA7 1976).[5]

Petitioner manufacturers moved for partial summary judgment against all plaintiffs that were indirect purchasers of concrete block from petitioners, contending that as a matter of law only direct purchasers could sue for the alleged overcharge.[6] The District Court granted petitioners' motion, but the Court of Appeals reversed, holding that indirect purchasers such as respondents in this case can recover treble damages for an illegal overcharge if they can prove that the overcharge

---

[4] Section 1 of the Sherman Act, c. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1, provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . ."

[5] Private treble-damages actions brought by masonry contractors, general contractors, and private builders were settled, without prejudice to this suit. 536 F. 2d, at 1164.

[6] The responses to petitioners' interrogatories indicated that only four of the plaintiffs represented by the State purchased concrete block directly from one of the petitioners. 67 F. R. D. 461, 463 (ND Ill. 1975). Only 7% of the 700 public entities named as plaintiffs were apparently able to state the cost of the concrete block used in their building projects. Brief for Petitioners 5 n. **. In the only example cited to us by the parties, the cost of the concrete block was reported as less than one-half of one percent of the total cost of the project. *Id.*, at 21 n. *.

was passed on to them through intervening links in the distribution chain.[7]

We granted certiorari, 429 U. S. 938 (1976), to resolve a conflict among the Courts of Appeals [8] on the question whether the offensive use of pass-on authorized by the decision below is consistent with *Hanover Shoe*'s restrictions on the defensive use of pass-on. We hold that it is not, and we reverse. We reach this result in two steps. First, we conclude that whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants. Because *Hanover Shoe* would bar petitioners from using respondents' pass-on theory as a defense to a treble-damages suit

---

[7] The District Court based its grant of summary judgment against the indirect purchaser plaintiffs not on the ground that this Court's construction of § 4 in *Hanover Shoe* barred their attempt to show that the masonry and general contractors passed on the overcharge to them, but rather on the ground that these indirect purchasers lacked standing to sue for an overcharge on one product—concrete block—that was incorporated by the masonry and general contractors into an entirely new and different product—a building. 67 F. R. D., at 467–468. Although the Court of Appeals held that these indirect purchasers did have standing to sue for damages under § 4, it agreed with the District Court's reading of *Hanover Shoe*. 536 F. 2d, at 1164–1167. Because we find *Hanover Shoe* dispositive here, we do not address the standing issue, except to note, as did the Court of Appeals below, 536 F. 2d, at 1166, that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4. See Handler & Blechman, Antitrust and the Consumer Interest: The Fallacy of *Parens Patriae* and A Suggested New Approach, 85 Yale L. J. 626, 644–645 (1976).

[8] Compare *Mangano* v. *American Radiator & Standard Sanitary Corp.*, 438 F. 2d 1187 (CA3 1971), aff'g *Philadelphia Housing Auth.* v. *American Radiator & Standard Sanitary Corp.*, 50 F. R. D. 13 (ED Pa. 1970), with *In re Western Liquid Asphalt Cases*, 487 F. 2d 191 (CA9 1973), cert. denied *sub nom. Standard Oil Co. of Cal.* v. *Alaska*, 415 U. S. 919 (1974); *West Virginia* v. *Chas. Pfizer & Co.*, 440 F. 2d 1079 (CA2), cert. denied *sub nom. Cotler Drugs, Inc.* v. *Chas. Pfizer & Co.*, 404 U. S. 871 (1971), and the decision below, *Illinois* v. *Ampress Brick Co.*, 536 F. 2d 1163.

by the direct purchasers (the masonry contractors),[9] we are faced with the choice of overruling (or narrowly limiting) *Hanover Shoe* or of applying it to bar respondents' attempt to use this pass-on theory offensively. Second, we decline to abandon the construction given § 4 in *Hanover Shoe*—that the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party "injured in his business or property" within the meaning of the section—in the absence of a convincing demonstration that the Court was wrong in *Hanover Shoe* to think that the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that any party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it.

## II

The parties in this case agree that however § 4 is construed with respect to the pass-on issue, the rule should apply equally to plaintiffs and defendants—that an indirect purchaser should not be allowed to use a pass-on theory to recover damages from a defendant unless the defendant would be allowed to use a pass-on defense in a suit by a direct purchaser. Respondents, in arguing that they should be allowed to recover by showing pass-on in this case, have conceded that petitioners should be allowed to assert a pass-on defense against direct purchasers of concrete block, Tr. of Oral Arg. 33, 48; they ask this Court to limit *Hanover Shoe*'s bar on pass-on defenses to its "particular factual context" of overcharges for capital goods used to manufacture new products. *Id.,* at 41; see *id.,* at 36, 47–48.

Before turning to this request to limit *Hanover Shoe,* we consider the substantially contrary position, adopted by our dissenting Brethren, by the United States as *amicus curiae,* and by lower courts that have allowed offensive use of pass-on, that the unavailability of a pass-on theory to a defendant

---

[9] See *infra,* at 734–735.

should not necessarily preclude its use by plaintiffs seeking treble damages against that defendant.[10] Under this view, *Hanover Shoe*'s rejection of pass-on would continue to apply to defendants unless direct and indirect purchasers were both suing the defendant in the same action; but it would not bar indirect purchasers from attempting to show that the overcharge had been passed on to them. We reject this position for two reasons.

First, allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants. Even though an indirect purchaser had already recovered for all or part of an overcharge passed on to it, the direct purchaser would still recover automatically the full amount of the overcharge that the indirect purchaser had shown to be passed on; similarly, following an automatic recovery of the full overcharge by the direct purchaser, the indirect purchaser could sue to recover the same amount. The risk of duplicative recoveries created by unequal application of the *Hanover Shoe* rule is much more substantial than in the more usual situation where the defendant is sued in two different lawsuits by plaintiffs asserting conflicting claims to the same fund. A one-sided application of *Hanover Shoe* substantially increases the possibility of inconsistent adjudications—and therefore of unwarranted multiple liability for the defendant—by *presuming* that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff; overlapping recoveries are certain to result from the two law-

---

[10] *Post*, at 753 (BRENNAN, J., dissenting); *post*, at 765–766 (BLACKMUN, J., dissenting); Brief for United States as *Amicus Curiae* 4–6, 15–21; Tr. of Oral Arg. 50–54, 57–60; *West Virginia* v. *Chas. Pfizer & Co.*, 440 F. 2d, at 1086–1088; *Boshes* v. *General Motors Corp.*, 59 F. R. D. 589, 592–598 (ND Ill. 1973); *In re Master Key Antitrust Litigation,* 1973-2 Trade Cas. ¶ 74,680, p. 94,978 (Conn.); *Carnivale Bag Co.* v. *Slide-Rite Mfg. Corp.*, 395 F. Supp. 287, 290–291 (SDNY 1975). See also Brief for State of California as *Amicus Curiae* 6–12.

suits unless the indirect purchaser is unable to establish any pass-on whatsoever. As in *Hawaii* v. *Standard Oil Co. of Cal.,* 405 U. S. 251, 264 (1972), we are unwilling to "open the door to duplicative recoveries" under § 4.[11]

Second, the reasoning of *Hanover Shoe* cannot justify unequal treatment of plaintiffs and defendants with respect to the permissibility of pass-on arguments. The principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-

---

[11] In recognition of the need to avoid duplicative recoveries, courts adopting the view that pass-on theories should not be equally available to plaintiffs and defendants have agreed that defendants should be allowed to assert a pass-on defense against a direct purchaser if an indirect purchaser is also attempting to recover on a pass-on theory *in the same lawsuit. E. g., In re Western Liquid Asphalt Cases,* 487 F. 2d, at 200–201; *West Virginia* v. *Chas. Pfizer & Co.,* 440 F. 2d, at 1088. See also Comment, Standing to Sue in Antitrust Cases: The Offensive Use of Passing-On, 123 U. Pa. L. Rev. 976, 995–998 (1975); Comment, *Mangano* and Ultimate-Consumer Standing: The Misuse of the *Hanover* Doctrine, 72 Colum. L. Rev. 394, 410 (1972); Brief for United States as *Amicus Curiae* 25. Various procedural devices, such as the Multidistrict Litigation Act, 28 U. S. C. § 1407, and statutory interpleader, 28 U. S. C. § 1335, are relied upon to bring indirect and direct purchasers together in one action in order to apportion damages among them and thereby reduce the risk of duplicative recovery. These procedural devices cannot protect against multiple liability where the direct purchasers have already recovered by obtaining a judgment or by settling, as is more likely (and as occurred here, see n. 5, *supra*); acknowledging that the risk of multiple recoveries is inevitably increased by allowing offensive but not defensive use of pass-on, *e. g.,* Comment, 123 U. Pa. L. Rev., *supra,* at 994, proponents of this approach ultimately fall back on the argument that it is better for the defendant to pay sixfold or more damages than for an injured party to go uncompensated. *E. g.,* Comment, 72 Colum. L. Rev., *supra,* at 411; Tr. of Oral Arg. 58 ("a little slopover on the shoulders of the wrongdoers . . . is acceptable"). We do not find this risk acceptable.

Moreover, even if ways could be found to bring all potential plaintiffs together in one huge action, the complexity thereby introduced into treble-damages proceedings argues strongly for retaining the *Hanover Shoe* rule. See Part III, *infra.*

put decisions "in the real economic world rather than an economist's hypothetical model," 392 U. S., at 493, and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom.[12] This perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants. However "long and complicated" the proceedings would be when defendants sought to prove pass-on, *ibid.*, they would be equally so when the same evidence was introduced by plaintiffs. Indeed, the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution. The demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which

---

[12] That this rationale was more important in the decision to bar the pass-on defense than the second reason—the concern that if pass-on defenses were permitted indirect purchasers would lack the incentive to sue and antitrust violators would retain their ill-gotten gains, see *supra*, at 725–726, is shown by the fact that the Court recognized an exception for pre-existing cost-plus contracts, which "mak[e] it *easy to prove* that [the direct purchaser] has not been damaged." 392 U. S., at 494. (Emphasis added.) The amount of the stake that the customers of the direct purchaser have in a lawsuit against the overcharger is not likely to depend on whether they buy under a cost-plus contract or in a competitive market, but the Court allowed a pass-on defense in the former situation because the pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser. See Note, The Effect of Hanover Shoe on the Offensive Use of the Passing-on Doctrine, 46 So. Cal. L. Rev. 98, 108 (1972).

the price-fixed goods changed hands before they reached the plaintiff.[13]

It is argued, however, that *Hanover Shoe* rests on a policy of ensuring that a treble-damages plaintiff is available to deprive antitrust violators of "the fruits of their illegality," *id.*, at 494, a policy that would be furthered by allowing plaintiffs but not defendants to use pass-on theories. See, *e. g., In re Western Liquid Asphalt Cases*, 487 F. 2d 191, 197 (CA9 1973), cert. denied *sub nom. Standard Oil Co. of Cal.* v. *Alaska*, 415 U. S. 919 (1974); Brief for United States as *Amicus Curiae* 4–6, 12–13, 17–19.[14] We do not read the Court's

---

[13] Offensive use of pass-on by the last purchaser in the distribution chain is simpler in one respect than defensive use of pass-on against a direct purchaser that sells a product to other customers. In the latter case, even if the defendant shows that as a result of the overcharge the direct purchaser increased its price by the full amount of the overcharge, the direct purchaser may still claim injury from a reduction in the volume of its sales caused by its higher prices. This additional element of injury from reduced volume is not present in the suit by the final purchaser of the overcharged goods, where the issue regarding injury will be whether the defendant's overcharge caused the plaintiff to pay a higher price for whatever it purchased. But the final purchaser still will have to trace the overcharge through each step in the distribution chain. In our view, the difficulty of reconstructing the pricing decisions of intermediate purchasers at each step in the chain beyond the direct purchaser generally will outweigh any gain in simplicity from not having to litigate the effects of the passed-on overcharge on the direct purchaser's volume.

[14] We are urged to defer to evidence in the legislative history of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1394–1396, 15 U. S. C. § 15c *et seq.* (1976 ed.), that Congress understood *Hanover Shoe* as applying only to defendants. *Post*, at 756–758 (BRENNAN, J., dissenting); Brief for 47 States as *Amici Curiae* 14–15, n. 6; Brief for United States as *Amicus Curiae* 14–15, and n. 12. The House Report (apparently viewing the issue as one of standing, cf. n. 7, *supra*) endorsed the Ninth Circuit's view of "the pro-enforcement thrust of *Hanover Shoe*" in *In re Western Liquid Asphalt Cases, supra,* and criticized lower court decisions barring pass-on arguments by plaintiffs. H. R. Rep. No. 94–499, p. 6 n. 4 (1975). In addition, one of the sponsors of this legislation, Representative Rodino, clearly assumed that the issue of offensive use of

concern in *Hanover Shoe* for the effectiveness of the treble-damages remedy as countenancing unequal application of the Court's pass-on rule. Rather, we understand *Hanover Shoe*

pass-on under § 4 would be resolved favorably to plaintiffs by this Court. See 122 Cong. Rec. H10295 (daily ed., Sept. 16, 1976).

Congress made clear, however, that this legislation did not alter the definition of which overcharged persons were injured within the meaning of § 4. It simply created a new procedural device—*parens patriae* actions by States on behalf of their citizens—to enforce existing rights of recovery under § 4. The House Report quoted above stated that the *parens patriae* provision "creates no new substantive liability"; the relevant language of the newly enacted § 4C (a) of the Clayton Act tracks that of existing § 4, showing that it was intended only as "an alternative means . . . for the vindication of existing substantive claims." H. R. Rep. No. 94–499, *supra*, at 9. "The establishment of an alternative remedy does not increase any defendant's liability." *Ibid.* Representative Rodino himself acknowledged in the remarks cited above that this legislation did not create a right of recovery for consumers where one did not already exist.

We thus cannot agree with the dissenters that the legislative history of the 1976 Antitrust Improvements Act is dispositive as to the interpretation of § 4 of the Clayton Act, enacted in 1914, or the predecessor section of the Sherman Act, enacted in 1890. *Post,* at 756–758. The cases cited by MR. JUSTICE BRENNAN, *post,* at 765 n. 24, to support his reliance on this legislation all involved specific statutory language that was thought to clarify the meaning of an earlier statute. *E. g., Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 380–381 (1969) (language in 1959 amendment to § 315 of the Communications Act approved fairness doctrine adopted by FCC under the "public interest" standard of the original Act). Here, by contrast, Congress borrowed the language of § 4 in adding the *parens patriae* section. The views expressed by particular legislators as to the meaning of that language in § 4 "cannot serve to change the legislative intent of Congress . . . 'since the statements were [made] after passage of the [Clayton] Act.' " *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 132 (1974), quoting *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 639 n. 34 (1967).

While we do not lightly disagree with the reading of *Hanover Shoe* urged by these legislators, we think the construction of § 4 adopted in that decision cannot be applied for the exclusive benefit of plaintiffs. Should Congress disagree with this result, it may, of course, amend the section to change it. But it has not done so in the recent *parens patriae* legislation.

as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

We thus decline to construe § 4 to permit offensive use of a pass-on theory against an alleged violator that could not use the same theory as a defense in an action by direct purchasers. In this case, respondents seek to demonstrate that masonry contractors, who incorporated petitioners' block into walls and other masonry structures, passed on the alleged overcharge on the block to general contractors, who incorporated the masonry structures into entire buildings, and that the general contractors in turn passed on the overcharge to respondents in the bids submitted for those buildings. We think it clear that under a fair reading of *Hanover Shoe* petitioners would be barred from asserting this theory in a suit by the masonry contractors.

In *Hanover Shoe* this Court did not endorse the broad exception that had been recognized in that case by the courts below—permitting the pass-on defense against middlemen who did not alter the goods they purchased before reselling them.[15] The masonry contractors here could not be included under this exception in any event, because they transform the concrete block purchased from defendants into the masonry portions of buildings. But this Court in *Hanover Shoe*

---

[15] In a separate trial pursuant to Fed. Rule Civ. Proc. 42 (b), the District Court held that the defendant shoe machinery manufacturer was not permitted to assert a pass-on defense against its customer. 185 F. Supp. 826 (MD Pa.), aff'd, 281 F. 2d 481 (CA3), cert. denied, 364 U. S. 901 (1960). The District Court indicated that pass-on defenses were barred against "consumers" who use the defendant's product to make their own but not against "middlemen" who simply resell the defendant's product. 185 F. Supp., at 830–831. Both on interlocutory appeal and after trial on the merits, the Court of Appeals affirmed on the basis of the District Court's reasoning. See 392 U. S., at 488 n. 6.

indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost-plus contract. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case. The competitive bidding process by which the concrete block involved in this case was incorporated into masonry structures and then into entire buildings can hardly be said to circumvent complex market interactions as would a cost-plus contract.[16]

We are left, then, with two alternatives: either we must overrule *Hanover Shoe* (or at least narrowly confine it to its facts), or we must preclude respondents from seeking to recover on their pass-on theory. We choose the latter course.

### III

In considering whether to cut back or abandon the *Hanover Shoe* rule, we must bear in mind that considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation. See *Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974); *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–408 (1932) (Brandeis, J., dissenting). This presumption of adherence to our prior decisions construing legislative enactments would support our reaffirmance of the *Hanover Shoe*

---

[16] Another situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer. Cf. *Perkins* v. *Standard Oil Co.,* 395 U. S. 642, 648 (1969); *In re Western Liquid Asphalt Cases,* 487 F. 2d, at 197, 199.

construction of § 4, joined by eight Justices without dissent only a few years ago,[17] even if the Court were persuaded that the use of pass-on theories by plaintiffs and defendants in treble-damages actions is more consistent with the policies underlying the treble-damages action than is the *Hanover Shoe* rule. But we are not so persuaded.

Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

As we have indicated, potential plaintiffs at each level in the distribution chain are in a position to assert conflicting claims to a common fund—the amount of the alleged overcharge—by contending that the entire overcharge was absorbed at that particular level in the chain.[18] A treble-damages action brought by one of these potential plaintiffs (or one class of potential plaintiffs) to recover the overcharge implicates all three of the interests that have traditionally been thought to support compulsory joinder of absent and potentially adverse claimants: the interest of the defendant in

---

[17] The sole dissenting Justice in *Hanover Shoe* did not reach the pass-on question. 392 U. S., at 513.

[18] In this Part, we assume that use of pass-on will be permitted symmetrically, if at all. This assumption, of course, reduces the substantial risk of multiple liability for defendants that is posed by allowing indirect purchasers to recover for the overcharge passed on to them while at the same time allowing direct purchasers automatically to collect the entire overcharge. See *supra*, at 730–731. But the possibility of inconsistent judgments obtained by conflicting claimants remains nonetheless. Even this residual possibility justifies bringing potential and actual claimants together in one action if possible.

avoiding multiple liability for the fund; the interest of the absent potential plaintiffs in protecting their right to recover for the portion of the fund allocable to them; and the social interest in the efficient administration of justice and the avoidance of multiple litigation. Reed, Compulsory Joinder of Parties in Civil Actions, 55 Mich. L. Rev. 327, 330 (1957). See *Provident Tradesmens Bank & Trust Co.* v. *Patterson,* 390 U. S. 102, 110–111 (1968); 7 C. Wright & A. Miller, Federal Practice and Procedure § 1602 (1972).

Opponents of the *Hanover Shoe* rule have recognized this need for compulsory joinder in suggesting that the defendant could interplead potential claimants under 28 U. S. C. § 1335.[19] But if the defendant, for any of a variety of reasons,[20] does not choose to interplead the absent potential claimants, there would be a strong argument for joining them as "persons needed for just adjudication" under Fed. Rule Civ. Proc. 19 (a).[21] See Comment, Standing to Sue in Antitrust Cases:

---

[19] See n. 11, *supra.* Interpleader under Fed. Rule Civ. Proc. 22 (1) often would be unavailable because service of process for rule interpleader, as contrasted with statutory interpleader, does not run nationwide. See 3A J. Moore, Federal Practice ¶ 22.04[2] (1974).

[20] For example, a condition precedent for invoking statutory interpleader is the posting of a bond for the amount in dispute, 28 U. S. C. § 1335 (a) (2), see 3A J. Moore, *supra,* ¶ 22.10, and a defendant may be unwilling to put up a bond for the huge amounts normally claimed in multiple-party treble-damages suits. For a discussion of other circumstances in which statutory interpleader may be "impractical," see McGuire, The Passing-On Defense and the Right of Remote Purchasers to Recover Treble Damages under Hanover Shoe, 33 U. Pitt. L. Rev. 177, 197–198 (1971).

[21] Rule 19 (a) provides in part:

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter

The Offensive Use of Passing-On, 123 U. Pa. L. Rev. 976, 998 (1975). These absent potential claimants would seem to fit the classic definition of "necessary parties," for purposes of compulsory joinder, given in *Shields* v. *Barrow,* 17 How. 130, 139 (1855):

> "Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it."

See Notes of Advisory Committee on 1966 Amendment to Rule 19, 28 U. S. C. App., p. 7760; 7 C. Wright & A. Miller, *supra,* §§ 1604, 1618; 3A J. Moore, Federal Practice ¶ 19.08 (1974). The plaintiff bringing the treble-damages action would be required, under Fed. Rule Civ. Proc. 19 (c), to "state the names, if known," of these absent potential claimants; they should also be notified by some means that the action was pending.[22] Where, as would often be the case, the potential claimants at a particular level of distribution are so numerous that joinder of all is impracticable, a representative presumably would have to be found to bring them into the action as a class. See Fed. Rule Civ. Proc. 19 (d); 3A J. Moore, *supra,* ¶ 19.21.

It is unlikely, of course, that all potential plaintiffs could or would be joined. Some may not wish to assert claims to the

---

impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

[22] See the comment of the Advisory Committee on the 1966 Amendment to Rule 19: "In some situations it may be desirable to advise a person who has not been joined of the fact that the action is pending, and in particular cases the court in its discretion may itself convey this information by directing a letter or other informal notice to the absentee." 28 U. S. C. App., p. 7760.

overcharge; others may be unmanageable as a class; and still others may be beyond the personal jurisdiction of the court. We can assume that ordinarily the action would still proceed, the absent parties not being deemed "indispensable" under Fed. Rule Civ. Proc. 19 (b). See *Provident Tradesmens Bank & Trust Co.* v. *Patterson, supra.* But allowing indirect purchasers to recover using pass-on theories, even under the optimistic assumption that joinder of potential plaintiffs will deal satisfactorily with problems of multiple litigation and liability, would transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant. In treble-damages actions by ultimate consumers, the overcharge would have to be apportioned among the relevant wholesalers, retailers, and other middlemen, whose representatives presumably should be joined.[23] And in suits

[23] *E. g., Philadelphia Housing Auth.* v. *American Radiator & Standard Sanitary Corp.,* 50 F. R. D. 13 (ED Pa. 1970), aff'd *sub nom. Mangano* v. *American Radiator & Standard Sanitary Corp.,* 438 F. 2d 1187 (CA3 1971) (suit against manufacturers of plumbing fixtures on behalf of all homeowners in the United States). There often will be more levels of distribution or manufacture between the defendant and the ultimate consumers than the two levels (masonry and general contractors) in this case. For example, in *Philadelphia Housing Auth., supra,* the plaintiffs included homeowners who had bought used rather than new homes and who therefore had to show that each time their houses changed hands the sellers passed on part of the plumbing manufacturers' original overcharge. 50 F. R. D., at 19–20, 25–26. Treble-damages suits by ultimate consumers against any of the manufacturers of industrial raw materials or equipment that have been charged in recent Government price-fixing suits would involve not only several levels within a distribution chain, but also several separate chains of distribution; for example, chromite sand is used to make ingots, ingots are used to make steel, and steel is used to make consumer products. Handler & Blechman, *supra* n. 7, at 640 n. 77, and see *id.,* at 636–637 (citing Justice Department price-fixing suits against defendants far removed from consumers).

by direct purchasers or middlemen, the interests of ultimate consumers are similarly implicated.[24]

There is thus a strong possibility that indirect purchasers remote from the defendant would be parties to virtually every treble-damages action (apart from those brought against defendants at the retail level). The Court's concern in *Hanover Shoe* to avoid weighing down treble-damages actions with the "massive evidence and complicated theories," 392 U. S., at 493, involved in attempting to establish a pass-on defense against a direct purchaser applies *a fortiori* to the attempt to trace the effect of the overcharge through each step in the distribution chain from the direct purchaser to the ultimate consumer. We are no more inclined than we were in *Hanover Shoe* to ignore the burdens that such an attempt would impose on the effective enforcement of the antitrust laws.

Under an array of simplifying assumptions, economic theory provides a precise formula for calculating how the overcharge is distributed between the overcharged party (passer) and its customers (passees). *If* the market for the passer's product is perfectly competitive; *if* the overcharge is imposed equally on all of the passer's competitors; and *if* the passer maximizes its profits, then the ratio of the shares of the overcharge borne by passee and passer will equal the ratio of the elasticities of supply and demand in the market for the passer's product.[25]

---

[24] *E. g., Donson Stores, Inc.* v. *American Bakeries Co.,* 58 F. R. D. 481 (SDNY 1973) (motion to intervene by a putative class of 20 million consumers of bread in treble-damages action against bread manufacturers). Cf. Handler & Blechman, *supra,* n. 7, at 653 (arguing that the effect of legislation authorizing States to bring treble-damages actions on behalf of their citizens, see n. 14, *supra,* will be to interject claims on behalf of large classes of consumers into treble-damages suits brought by middlemen). Thus in this case the plaintiff housing authorities, App. 20, presumably have passed on part of the alleged overcharge to their tenants and subtenants, who would have to be brought into the suit before damages could be fairly apportioned.

[25] An overcharge imposed by an antitrust violator or group of violators

Even if these assumptions are accepted, there remains a serious problem of measuring the relevant elasticities—the percentage change in the quantities of the passer's product demanded and supplied in response to a one percent change in price. In view of the difficulties that have been encountered, even in informal adversary proceedings, with the statistical techniques used to estimate these concepts, see Finkelstein, Regression Models in Administrative Proceedings, 86 Harv. L. Rev. 1442, 1444 (1973), it is unrealistic to think that elasticity studies introduced by expert witnesses will resolve the pass-on issue. We need look no further than our own difficulties with sophisticated statistical methodology that were evident last Term in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), and its companion cases. See *id.,* at 184–185 (joint opinion of STEWART, POWELL, and STEVENS, JJ.); 233–236 (MARSHALL, J., dissenting); *Roberts* v. *Louisiana,* 428 U. S. 325, 354–355 (1976) (WHITE, J., dissenting).

More important, as the *Hanover Shoe* Court observed, 392 U. S., at 493, "in the real economic world rather than an economist's hypothetical model," the latter's drastic simplifications generally must be abandoned. Overcharged direct purchasers often sell in imperfectly competitive markets. They often compete with other sellers that have not been subject to the overcharge; and their pricing policies often cannot be explained solely by the convenient assumption of profit maximization.[26] As we concluded in *Hanover Shoe,* 392 U. S., at 492,

---

on their customers is analytically equivalent to an excise tax imposed on the violator's product in the amount of the overcharge. The effect of such an overcharge can be calculated using the economic theorems for the incidence of an excise tax. See Schaefer, Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis, 16 Wm. & Mary L. Rev. 883, 887, 893 (1975), and sources cited in *id.,* at 887 n. 21.

[26] Thus, in the instant case respondents have offered to prove that general and masonry contractors calculate their bids by adding a percentage markup to the cost of their materials, Brief for Respondents 20–23,

attention to "sound laws of economics" can only heighten the awareness of the difficulties and uncertainties involved in determining how the relevant market variables would have behaved had there been no overcharge.[27]

It is quite true that these difficulties and uncertainties will be less substantial in some contexts than in others. There have been many proposals to allow pass-on theories in some of these contexts while preserving the *Hanover Shoe* rule in others. Respondents here argue, not without support from some lower courts,[28] that pass-on theories should be permitted for middlemen that resell goods without altering them and for contractors that add a fixed percentage markup to the cost of their materials in submitting bids. Brief for Respondents 9–30; Tr. of Oral Arg. 36–48. Exceptions to the *Hanover Shoe* rule have also been urged for other situations in which most of the overcharge is purportedly passed on—for example, where a price-fixed good is a small but vital input into a

---

rather than by attempting to equate marginal cost and marginal revenue as required by an explicit profit-maximizing strategy.

[27] MR. JUSTICE BRENNAN in dissent argues that estimating a passee's damages requires nothing more than estimating what the passer's price would have been absent the violation, and suggests that apportioning the overcharge throughout the distribution chain is "no different from and no more complicated" than the initial task of estimating the amount of the overcharge itself. *Post,* at 758–759, and n. 14. But as the dissent recognizes, *post,* at 749 n. 3, unless the indirect purchaser is at the end of the distribution chain it can claim damages not only from the portion of the overcharge it absorbs but also from the portion it passes on, which causes a reduction in sales volume under less than perfectly inelastic demand conditions. See n. 13, *supra.* The difficulties of the task urged upon us by the dissenters cannot be so easily brushed aside.

In any event, as we understand the dissenters' argument, it reduces to the proposition that because antitrust cases are already complicated there is little harm in making them more so. We disagree.

[28] See, *e. g., West Virginia* v. *Chas. Pfizer & Co.,* 314 F. Supp. 710, 745–746 (SDNY 1970), aff'd, 440 F. 2d 1079 (CA2 1971); *Boshes* v. *General Motors Corp.,* 59 F. R. D., at 597.

much larger product, making the demand for the price-fixed good highly inelastic. Compare *Philadelphia Housing Auth.* v. *American Radiator & Standard Sanitary Corp.*, 50 F. R. D. 13 (ED Pa. 1970), aff'd *sub nom. Mangano* v. *American Radiator & Standard Sanitary Corp.*, 438 F. 2d 1187 (CA3 1971), with *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (Conn.). See *Schaefer, supra* n. 25, at 918–925.

We reject these attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets.[29] An exception allowing evidence of pass-on by middlemen that resell the goods they purchase of course would be of no avail to respondents, because the contractors that allegedly passed on the overcharge on the block incorporated it into buildings. See *supra,* at 735. An exception for the contractors here on the ground that they purport to charge a fixed percentage above their costs would substantially erode the *Hanover Shoe* rule without justification. Firms in many sectors of the economy rely to an extent on cost-based rules of thumb in setting prices. See F. Scherer, Industrial Market Structure and Economic Performance 173–179 (1970). These rules are not adhered to rigidly, however; the extent of the markup (or the allocation of costs) is varied to reflect demand conditions. *Id.,* at 176–177. The intricacies of tracing the effect of an overcharge on the purchaser's prices, costs, sales, and profits thus are not spared the litigants.

More generally, the process of classifying various market situations according to the amount of pass-on likely to be

---

[29] We note that supporters of the offensive use of pass-on, other than litigants in particular cases, generally have not contended for a halfway rejection of *Hanover Shoe* that would permit offensive use of pass-on in some types of market situations but not in others. See, *e. g.,* Tr. of Oral Arg. 57 (United States as *amicus curiae*); Note, The Defense of "Passing On" in Treble Damage Suits Under the Antitrust Laws, 70 Yale L. J. 469, 476, 478 (1961); commentators cited in n. 11, *supra.*

involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same "massive evidence and complicated theories" into treble-damages proceedings, albeit at a somewhat higher level of generality. As we have noted, *supra,* at 735–736, *Hanover Shoe* itself implicitly discouraged the creation of exceptions to its rule barring pass-on defenses, and we adhere to the narrow scope of exemption indicated by our decision there.

The concern in *Hanover Shoe* for the complexity that would be introduced into treble-damages suits if pass-on theories were permitted was closely related to the Court's concern for the reduction in the effectiveness of those suits if brought by indirect purchasers with a smaller stake in the outcome than that of direct purchasers suing for the full amount of the overcharge. The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group. Added to the uncertainty of how much of an overcharge could be established at trial would be the uncertainty of how that overcharge would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement.

We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws, see, *e. g., Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 139 (1968), supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden

of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers.[30] But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of " 'private attorneys general' " to enforce the antitrust laws under § 4, *Hawaii v. Standard Oil Co. of Cal.*, 405 U. S., at 262, is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

It is true that, in elevating direct purchasers to a preferred position as private attorneys general, the *Hanover Shoe* rule denies recovery to those indirect purchasers who may have been actually injured by antitrust violations. Of course, as MR. JUSTICE BRENNAN points out in dissent, "from the deterrence standpoint, it is irrelevant to whom damages are paid, so long as some one redresses the violation." *Post,* at 760. But § 4 has another purpose in addition to deterring violators and depriving them of "the fruits of their illegality," *Hanover Shoe*, 392 U. S., at 494; it is also designed to compensate victims of antitrust violations for their injuries. *E. g., Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485–486 (1977). *Hanover Shoe* does further the goal of compensation to the extent that the direct purchaser absorbs at least some and often most of the overcharge. In view of the considerations supporting the *Hanover Shoe* rule, we are unwilling to carry the compensation principle to its logical extreme by attempting to allocate damages among all "those within the defendant's chain of distribution," *post,* at 761, especially

---

[30] See, *e. g., In re Western Liquid Asphalt Cases*, 487 F. 2d, at 198; Wheeler, Antitrust Treble-Damage Actions: Do They Work?, 61 Calif. L. Rev. 1319, 1325 (1973).

because we question the extent to which such an attempt would make individual victims whole for actual injuries suffered rather than simply depleting the overall recovery in litigation over pass-on issues. Many of the indirect purchasers barred from asserting pass-on claims under the *Hanover Shoe* rule have such a small stake in the lawsuit that even if they were to recover as part of a class, only a small fraction would be likely to come forward to collect their damages.[31] And given the difficulty of ascertaining the amount absorbed by any particular indirect purchaser, there is little basis for believing that the amount of the recovery would reflect the actual injury suffered.

---

[31] Commentators have noted that recoveries in treble-damages actions aggregating large numbers of small claims often have failed to compensate the individuals on behalf of whom the suits have been brought. *E. g.*, Handler, The Shift from Substantive to Procedural Innovations in Antitrust Suits—the Twenty-Third Annual Antitrust Review, 71 Colum. L. Rev. 1, 9–10 (1971); Wheeler, *supra*, n. 30, at 1339; Kirkham, Complex Civil Litigation—Have Good Intentions Gone Awry?, 70 F. R. D. 199, 206–207 (1976).

The dissenting opinion of MR JUSTICE BRENNAN appears to suggest that the 1976 *parens patriae* legislation, see n. 14, *supra*, provides an answer to this problem of compensating indirect purchasers for small injuries. *Post*, at 764 n. 23. Quite to the contrary, the Act "recognizes that rarely, if ever, will all potential claimants actually come forward to secure their share of the recovery," and that "the undistributed portion of the fund . . . will often be substantial." H. R. Rep. No. 94–499, p. 16 (1975). The portion of the fund recovered in a *parens patriae* action that is not used to compensate the actual injuries of antitrust victims is to be used as "a civil penalty . . . deposited with the State as general revenues," Clayton Act § 4E (2), 15 U. S. C. § 15e (2) (1976 ed.), enacted by the 1976 Act, or "for some public purposes benefiting, as closely as possible, the class of injured persons," such as reducing the price of the overcharged goods in future sales. H. R. Rep. No. 94–499, *supra*, at 16. That Congress chose to provide such innovative methods of distributing damages awarded in a *parens patriae* action under newly enacted § 4C of the Clayton Act, 15 U. S. C. § 15c (1976 ed.), does not eliminate the obstacles to compensating indirect purchasers bringing traditional suits under § 4.

For the reasons stated, the judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN join, dissenting.

Respondent State of Illinois brought this treble-damages civil antitrust action under § 4 of the Clayton Act on behalf of itself and various local governmental entities in the Greater Chicago area alleging that an overcharge in the price of concrete block used in the construction of public buildings was made by the petitioners, manufacturers and sellers of concrete block, pursuant to a price-fixing conspiracy in violation of § 1 of the Sherman Act, 15 U. S. C. § 1.[1] Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, broadly provides: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ."

Decisions of the Court defining the reach of § 4 have been consistent with its broad objectives: to compensate victims of antitrust violations and to deter future violations. The Court has stated that § 4 "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers . . . [but] is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 236 (1948).[2]

---

[1] The block was sold to various general and special contractors who had successfully bid to construct public buildings. The State was thus an indirect purchaser of the block.

[2] There is, of course, a point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions. See the discussion in Part III, *infra,* at 760–761.

Today's decision that § 4 affords a remedy only to persons who purchase directly from an antitrust offender is a regrettable retreat from that line of cases. Section 4 was clearly intended to operate to protect individual consumers who purchase through middlemen. Indeed, Congress acted on the premise that § 4 gave a cause of action to indirect as well as direct purchasers when it recently enacted the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1394–1396, 15 U. S. C. § 15c *et seq.* (1976 ed.), and authorized state attorneys general to sue as *parens patriae* to recover damages on behalf of citizens of their various States.

Today's decision flouts Congress' purpose and severely undermines the effectiveness of the private treble-damages action as an instrument of antitrust enforcement. For in many instances, the brunt of antitrust injuries is borne by indirect purchasers, often ultimate consumers of a product, as increased costs are passed along the chain of distribution.[3] In these instances, the Court's decision frustrates both the compensation and deterrence objectives of the treble-damages action. Injured consumers are precluded from recovering damages from manufacturers, and direct purchasers who act as middlemen have little incentive to sue suppliers so long as they may pass on the bulk of the illegal overcharges to the ultimate consumers. This frustration of the congressional scheme is in no way mandated by *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S. 481 (1968). To the contrary, the same considerations that *Hanover Shoe* held

---

[3] The portion of an illegal overcharge that a direct purchaser can pass on depends upon the elasticity of demand in the relevant product market. If the market is relatively inelastic, he may pass on a relatively large portion. If demand is relatively elastic, he may not be able to raise his price and will have to absorb the increase, making it up by decreasing other costs or increasing sales volume. It is extremely unlikely that a middleman could pass on the entire cost increase. But rarely would he have to absorb the entire increase. R. Posner, Antitrust Cases, Economic Notes, and Other Materials 147–149 (1974).

required rejection of the defendant's argument there, that because plaintiff had passed on cost increases to consumers in the form of higher prices defendant should be relieved of liability—especially the consideration that it is essential to the public interest to preserve the effectiveness of the private treble-damages action—require affirmance of the decision below construing § 4 to authorize respondents' suit.

I

In *Hanover Shoe, supra,* the Court held that a defendant in a treble-damages action could not escape liability, except in very limited circumstances,[4] by proof that the plaintiff had passed on illegal overcharges to others farther along in the chain of distribution.[5] The defendant in *Hanover Shoe,* United Shoe, argued that Hanover was not entitled to recover damages because the increased price it had paid for United's equipment [6] had in turn been reflected in the increased price at which Hanover had sold its shoes to the consuming public. The Court held that several reasons supported its conclusion that this defense was not available to United despite "the argument that sound laws of economics require" its recognition, 392 U. S., at 492. First, the Court followed earlier cases holding that the "victim of an overcharge is [immediately]

---

[4] The opinion recognizes that "there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." 392 U. S., at 494.

[5] *Hanover Shoe,* did not involve the consumers of the plaintiff's shoes, to whom the overcharge allegedly was passed. United's passing-on argument is referred to as "defensive" passing on. The State's position, seeking recovery of illegal overcharges allegedly passed on to it and its citizens, is referred to as "offensive" passing on.

[6] Hanover alleged that United monopolized the shoe machinery industry in violation of § 2 of the Sherman Act by its practice of leasing but refusing to sell its shoemaking machinery.

damaged within the meaning of § 4 to the extent of that over-charge." *Id.,* at 491. The particularly apt precedent supporting this proposition was *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531 (1918),[7] where a pass-on defense had been rejected because of "[t]he general tendency of the law, in regard to damages at least, . . . not to go beyond the first step," and the Court's belief that "[t]he carrier ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum. . . ." *Id.,* at 533–534. In other words, the requirement of privity between plaintiff and defendant was a reason to deny defendant the pass-on defense, since otherwise the defendant would be able to profit by his own wrong. *Hanover Shoe* cannot be read, however, as limiting actions to parties in privity with one another. That was made clear in *Perkins* v. *Standard Oil Co.,* 395 U. S. 642, 648 (1969), decided the next Term, a price discrimination case in which the Court traced an illegal overcharge through several levels in the chain of distribution, ultimately holding that a plaintiff seeking to recover damages need show only a "causal connection between the price discrimination in violation of the [antitrust laws] and the injury suffered. . . . If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury." *Darnell-Taenzer* does, however, support *Hanover Shoe*'s denial of the pass-on defense for the other reasons relied upon in *Hanover Shoe:* the difficulty of proving and quantifying a pass-on, and the role of the treble-damages action as the most effective means of antitrust enforcement. 392 U. S., at 492–494.

The Court correctly discerned that the difficulty of recon-

---

[7] In *Darnell-Taenzer,* shippers brought suit for reparations against a railroad claiming that the railroad had charged unreasonable rates. The railroad argued that the shippers had in turn passed on to their customers any excess over the reasonable rate.

structing hypothetical pricing decisions,[8] would aggravate the already complex nature of antitrust litigation since pass-on defenses would become commonplace whenever the chain of distribution extended beyond the plaintiff. This would lessen the effectiveness of the treble-damages action, since ultimate consumers individually often suffer only minor damages and therefore have little incentive to bring suit. Limiting defendants' liability to the loss of profits suffered by direct purchasers would thus allow the antitrust offender to avoid having to pay the full social cost of his illegal conduct in many cases in which indirect purchasers failed to bring suit. Consequently,

> "those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness." *Id.*, at 494.

*Hanover Shoe* thus confronted the Court with the choice, as had been true in *Darnell-Taenzer*, of interpreting § 4 in a way that might overcompensate the plaintiff, who had certainly suffered some injury, or of defining it in a way that under-deters the violator by allowing him to retain a portion of his ill-gotten overcharges. The Court chose to interpret § 4 so as to allow the plaintiff to recover for the entire overcharge. This choice was consistent with recognition of the importance

---

[8] "[T]he impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different . . . , he would have chosen a different price. . . ." 392 U. S., at 492–493. The Court further observed that it is equally difficult to ascertain "what effect a change in a company's price will have on its total sales"; and it is all but impossible to demonstrate that the particular plaintiff "could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." *Id.*, at 493. See generally Posner, *supra*, n. 3, at 147–149.

of the treble-damages action in deterring antitrust violations.[9] But *Hanover Shoe* certainly did not imply that an indirect purchaser would not also have a cause of action under § 4 when the illegal overcharges were passed on to him.

Despite the superficial appeal of the argument that *Hanover Shoe* should be applied "consistently," thus precluding plaintiffs and defendants alike from proving that increased costs were passed along the chain of distribution, there are sound reasons for treating offensive and defensive passing-on cases differently. The interests at stake in "offensive" passing-on cases, where the indirect purchasers sue for damages for their injuries, are simply not the same as the interests at stake in the *Hanover Shoe,* or "defensive" passing-on situation. There is no danger in this case, for example, as there was in *Hanover Shoe,* that the defendant will escape liability and frustrate the objectives of the treble-damages action. Rather, the same policies of insuring the continued effectiveness of the treble-damages action and preventing wrongdoers from retaining the spoils of their misdeeds favor allowing indirect purchasers to prove that overcharges were passed on to them. *Hanover Shoe* thus can and should be limited to cases of defensive assertion of the passing-on defense to antitrust liability, where direct and indirect purchasers are not parties in the same action.[10] I fully agree with the observation:

"The attempt to transform a rejection of a defense

---

[9] The pass-on defense in *Hanover Shoe* was asserted by a defendant against whom a prima facie case of liability had already been made out. The Clayton Act provides: "A final judgment . . . rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws . . . shall be prima facie evidence against such defendant . . . ." 15 U. S. C. § 16 (a). The Government had secured a judgment against United in *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295 (Mass. 1953), summarily aff'd, 347 U. S. 521 (1954).

[10] Commentators almost unanimously conclude that, despite *Hanover Shoe,* § 4 should be construed to authorize indirect purchasers to recover

because it unduly hampers antitrust enforcement into a reason for a complete refusal to entertain the claims of a certain class of plaintiffs seems an ingenious attempt to turn the decision [in *Hanover Shoe*] and its underlying rationale on its head." *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680, pp. 94,978–94,979 (Conn.).

## II

### A

Today's decision goes far to frustrate Congress' objectives in creating the treble-damages action. Treble-damages actions were first authorized under § 7 of the Sherman Act, 26 Stat. 210. The legislative history of this section shows that it was conceived primarily as a remedy for "[t]he people of the United States as individuals," especially for consumers. See, *e. g.,* 21 Cong. Rec. 1767–1768 (1890) (remarks of Sen. George); see also *id.,* at 2612 (Sens. Teller and Reagan), 2615 (Sen. Coke), 2640 (Sen. Spooner).[11] In the Clayton Act of

upon proof that increases were passed on to them. See, *e. g.,* Comment, Standing to Sue in Antitrust Cases: The Offensive Use of Passing-on, 123 U. Pa. L. Rev. 976 (1975); Comment, *Mangano* and Ultimate-Consumer Standing: The Misuse of the *Hanover* Doctrine, 72 Colum. L. Rev. 394 (1972); Note, The Effect of Hanover Shoe on the Offensive Use of the Passing-on Doctrine, 46 So. Cal. L. Rev. 98 (1972). But see Handler & Blechman, Antitrust and the Consumer Interest: The Fallacy of *Parens Patriae* and A Suggested New Approach, 85 Yale L. J. 626, 638–655 (1976). In addition, most courts have read *Hanover Shoe* as not preventing indirect purchasers from attempting to prove that they have been injured. See, *e. g., Yoder Bros., Inc.* v. *California-Florida Plant Corp.,* 537 F. 2d 1347 (CA5 1976); *In re Western Liquid Asphalt Cases,* 487 F. 2d 191 (CA9 1973), cert. denied *sub nom. Standard Oil Co. of Cal.* v. *Alaska,* 415 U. S. 919 (1974); *Illinois* v. *Bristol-Myers Co.,* 152 U. S. App. D. C. 367, 470 F. 2d 1276 (1972); *West Virginia* v. *Chas. Pfizer & Co.,* 440 F. 2d 1079 (CA2), cert. denied *sub nom. Cotler Drugs, Inc.* v. *Chas. Pfizer & Co.,* 404 U. S. 871 (1971); *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (Conn.).

[11] A further indication of Congress' desire to create a remedy for all

1914, Congress extended the § 7 remedy to persons injured by "any violation of the antitrust laws." See *Brunswick Corp* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 486 n. 10 (1977), citing H. R. Rep. No. 627, 63d Cong., 2d Sess., 14 (1914). These actions were conceived primarily as " 'open[ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered.' " [12] *Brunswick, supra,* at 486 n. 10, quoting 51 Cong. Rec. 9073 (1914) (remarks of Rep. Webb); see, *e. g., id.,* at 9079 (Rep. Volstead), 9270 (Rep. Carlin), 9414–9417, 9466–9467, 9487–9495. See also the House debates following the conference committee report. *Id.,* at 16274–16275 (Rep. Webb), 16317–16319 (Rep. Floyd).

The Court has interpreted § 4 broadly, this in recognition of the plainly stated congressional objective, *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 4 (1958), that the private treble-damages action play a paramount role in the enforcement of the fundamental economic policy of the Nation; *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 130–131 (1969); *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.,* 381 U. S. 311, 318 (1965), and has concluded that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 139 (1968). The federal courts have accordingly been cautioned "not [to]

---

persons, including consumers, even though their individual injuries might be comparatively slight, was the elimination of the jurisdictional-amount requirement for antitrust actions. See 21 Cong. Rec. 2612, 3148–3149 (1890) (remarks of Sens. Sherman and Edmunds).

[12] The fact that damages are trebled both aids deterrence and provides the incentive of compensation, since it encourages suits for relatively minor injuries.

add requirements to burden the private litigant beyond what is specifically set forth by Congress in [the antitrust] laws," *Radovich* v. *National Football League,* 352 U. S. 445, 454 (1957), and express approval has been given the " 'tendency of the courts . . . to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights." *Bigelow* v. *RKO Radio Pictures,* 327 U. S. 251, 265–266 (1946). See also *Zenith Radio Corp.* v. *Hazeltine Research, Inc., supra,* at 130–131; *Perma Life Mufflers, Inc.* v. *International Parts Corp., supra; Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S., at 494. And *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.,* 364 U. S. 656, 660 (1961), emphasized that to plead a cause of action under § 4 "allegations adequate to show a violation and . . . that plaintiff was damaged thereby are all the law requires."

B

The recently enacted Hart-Scott-Rodino Antitrust Improvements Act of 1976 was expressly adopted to create "an effective mechanism to permit consumers to recover damages for conduct which is prohibited by the Sherman Act, by giving State attorneys general a cause of action [to sue as *parens patriae* on behalf of the States' citizens] against antitrust violators." S. Rep. No. 94–803, p. 6 (1976). Title III of the new Act responded to the holding of *Hawaii* v. *Standard Oil Co. of Cal.,* 405 U. S. 251 (1972), that the Clayton Act does not authorize a State to sue for damages for an injury to its general economy allegedly attributable to a violation of the antitrust laws. The Senate Report accompanying the new Act expressly found that "[t]he economic burden of most antitrust violations is borne by the consumer in the form of higher prices for goods and services," S. Rep. No. 94–803, *supra,* at 39, and it is clear that the new Act is intended to provide a remedy

for injured consumers whether or not they purchased directly from the violator. The Senate Report states, *id.*, at 42:

"A direct cause of action is granted the States to avoid the inequities and inconsistencies of restrictive judicial interpretations. . . . Section 4C is intended to assure that consumers are not precluded from the opportunity of proving the amount of their damage and to avoid problems with respect to manageability [of class actions], *standing, privity, target area, remoteness, and the like.*"[13] (Emphasis supplied.)

Representative Rodino, a sponsor, stated during the House debates:

"[A]ssuming the State attorney general proves a violation, and proves that an overcharge was 'passed on' to the consumers, injuring them 'in their property'; that is, their pocketbooks—recoveries are authorized by the compromise bill whether or not the consumers purchased directly from the price fixer, or indirectly, from intermediaries, retailers, or middlemen. The technical and procedural argument that consumers have no 'standing' whenever they are not 'in privity' with the price fixer, and have not purchased directly from him, is rejected by the compromise bill. Opinions relying on this procedural

---

[13] Congress rejected earlier Court of Appeals and District Court decisions erecting standing barriers to suits by indirect purchasers and chose instead to pattern the Act "after such innovative decisions as *In re Western Liquid Asphalt Cases,* 487 F. 2d 191 (9th Cir. 1973); *In re Master Key Litigation,* 1973 Trade Cases ¶ 74,680 and 1975 Trade Cases ¶ 60,377 (DC Conn.); *State of Illinois* v. *Ampress Brick Co.,* 1975 Trade Cases ¶ 60,295 (DC Ill.) [this case below]; *Carnivale Bag Co.* v. *Slide Rite Mfg.,* 1975 Trade Cases ¶ 60,370 (S. D. N. Y.); *In re Antibiotics Antitrust Actions,* 333 F. Supp. 278 (S. D. N. Y. 1971); and *West Virginia* v. *Charles Pfizer & Co.,* 440 F. 2d 1079 (2d Cir. 1971)." Congress accepted these decisions as correctly stating the law. S. Rep. No. 94–803, pp. 42–43 (1976).

technicality . . . are squarely rejected by the compromise bill." 122 Cong. Rec. H10295 (daily ed. Sept. 16, 1976).

It is difficult to see how Congress could have expressed itself more clearly. Even if the question whether indirect purchasers could recover for damages passed on to them was open before passage of the 1976 Act, and I do not believe that it was, Congress' interpretation of § 4 in enacting the *parens patriae* provision should resolve it in favor of their authority to sue. Indeed, the House Report accompanying the bill actually referred to the opinion of the District Court in this case as an example of the correct answer. N. 13, *supra*. The Court's tortuous efforts to impose a "consistency" upon this area of the law that Congress has so clearly rejected is a return to the "legal somersaults and twistings and turnings" of the Court's earlier opinions that ultimately led to the passage of the Clayton Act in 1914 to salvage the ailing Sherman Act. See 51 Cong. Rec. 9086 (1914) (remarks of Rep. Kelly).

### III

*Hanover Shoe* correctly observed that the necessity of tracing a cost increase through several levels of a chain of distribution "would often require additional long and complicated proceedings involving massive evidence and complicated theories." 392 U. S., at 493. But this may be said of almost all antitrust cases. *Hanover Shoe* itself highlights this unavoidable complication, in that it requires the plaintiff to prove a probable course of events which *would have occurred* but for the violation.[14] In essence, estimating the amount of

---

[14] In *Hanover Shoe,* the measure of damages was the difference between the amount Hanover paid for the lease and the amount it *would have paid* had United agreed to sell the machinery. It has been suggested that the burden of demonstrating a pass-on may be no more difficult or speculative than the plaintiff's initial task of proving an overcharge in the first instance. See Pollock, Automatic Treble Damages and the Passing-on Defense: The Hanover Shoe Decision, 13 Antitrust Bull. 1183, 1210 (1968).

damages passed on to an indirect purchaser is no different from and no more complicated than estimating what the middleman's selling price would have been, absent the violation. See *ante,* at 733 n. 13.

Nor should the fact that the price-fixed product in this case (the concrete block) was combined with another product (the buildings) before resale operate as an absolute bar to recovery. It may well be true, as the State claims, that the cost of the block was included separately in the project bids and therefore can be factored out from the price of the building with relative certainty. In any case, this is a factual matter to be determined based on the strength of the plaintiff's evidence.[15] See, *e. g., In re Western Liquid Asphalt Cases,* 487 F. 2d 191 (CA9 1973), cert. denied *sub nom. Standard Oil Co. of Cal.* v. *Alaska,* 415 U. S. 919 (1974). Admittedly, there will be many cases in which the plaintiff will be unable to prove that the overcharge was passed on. In others, the portion of the overcharge passed on may be only approximately determinable. But again, this problem hardly distinguishes this case from other antitrust cases. Reasoned estimation is required in all antitrust cases, but "while the damages [in such cases] may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co.* v. *Paterson Co.,* 282 U. S. 555, 563 (1931). See also *Bigelow* v. *RKO Radio Pictures,* 327 U. S., at 266; *Eastman Kodak Co.* v. *Southern Photo Materials Co.,* 273 U. S. 359, 379 (1927). Lack of precision in apportioning damages between direct and indirect purchasers is thus plainly not a convincing reason for denying

---

[15] One commentator has suggested that, in deciding whether to permit recovery by indirect purchasers in a particular case, courts should consider the number of intervening hands the product has passed through and the extent of its change in the process. P. Areeda, Antitrust Analysis: Problems, Text, Cases 75 (2d ed. 1974).

indirect purchasers an opportunity to prove their injuries and damages. Moreover, from the deterrence standpoint, it is irrelevant to whom damages are paid, so long as someone redresses the violation. Antitrust violators are equally deterred whether the judgments against them are in favor of direct or indirect purchasers. *Hanover Shoe* said as much. The Court's decision recognized that some plaintiffs would recover more than their due, but concluded that the necessity of assuring that *someone* recover and thus deter future violations and prevent the antitrust offender from profiting by his illegal overcharge outweighed any resulting injustice.[16]

I concede that despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable. See, *e. g., Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477 (1977); *Hawaii* v. *Standard Oil Co. of Cal.,* 405 U. S. 251 (1972). Courts have therefore developed various tests of antitrust "standing," not unlike the concept of proximate cause in tort law, to define that point. The definition has been variously articulated, usually in terms of two tests. The more restrictive test focuses on the directness of the injury;[17] the more liberal, and more widely accepted, on whether the plaintiff is within the "target area" of the defendant's violation.[18]

---

[16] This holding is consistent with the Court's continuing concern for the effectiveness of the treble-damages action, which has been sustained even when the plaintiff was "no less morally reprehensible than the defendant" with whom he had conspired. *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 139 (1968).

[17] See, *e. g., Loeb* v. *Eastman Kodak Co.,* 183 F. 704 (CA3 1910).

[18] Earlier this Term, *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* disallowed a treble-damages recovery, stating that in order to recover antitrust plaintiffs must prove *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." 429 U. S., at 489. At least one Court of Appeals has rephrased the target-area test in terms of whether the injury to the plaintiff is a reasonably foreseeable consequence of the defendant's illegal conduct. *Mulvey* v. *Samuel Goldwyn Productions,* 433 F. 2d 1073 (CA9 1970), cert. denied, 402 U. S. 923 (1971).

But if the broad language of § 4 means anything, surely it must render the defendant liable to those within the defendant's chain of distribution. It would indeed be "paradoxical to deny recover to the ultimate consumer while permitting the middlemen a windfall recovery." P. Areeda, Antitrust Analysis: Problems, Text, Cases 75 (2d ed. 1974).

## IV

I acknowledge some abstract merit in the argument that to allow indirect purchasers to sue, while, at the same time, precluding defendants from asserting pass-on defenses in suits by direct purchasers, subjects antitrust defendants to the risk of multiple liability. But as a practical matter, existing procedural mechanisms can eliminate this danger in most instances. Even though, as the Court says, no procedure currently exists which can eliminate the possibility entirely, *ante,* at 731 n. 11, the hypothetical possibility that a few defendants might be subjected to the danger of multiple liability does not, in my view, justify erecting a bar against all recoveries by indirect purchasers without regard to whether the particular case presents a significant danger of double recovery. The "double recovery" specter was argued in the Congress that passed the Hart-Scott-Rodino Act, and was rejected. The Senate Report recorded the Act's purpose to codify the holding of the Court of Appeals for the Ninth Circuit in *In re Western Liquid Asphalt Cases, supra:*

" 'We therefore see no problem of double recovery, and we believe that if this difficulty should arise in some other connection, the district court will be able to fashion relief accordingly. In addition to the court's control over its decree, numerous devices exist. We note that the consolidation of cases, which has already occurred, is one means of averting duplicitous awards. The short, four-year statute of limitations is another; later suits, after

final judgment herein, are unlikely. 15 U. S. C. § 15b. In other cases, it may be that statutory interpleader, 28 U. S. C. § 1335, could be used by antitrust defendants to avoid double liability. If necessary, special masters may be appointed to handle complex cases. Finally, there are the doctrines of res judicata and collateral estoppel and procedures for compulsory joinder. The day is long past when courts, particularly federal courts, will deny relief to a deserving plaintiff merely because of procedural difficulties or problems of apportioning damages.'

"We would prefer to place the burden of proving apportionment upon appellees, rather than deny all recovery to appellants. Such a burden would be the consequence of appellees' illegal acts, not appellants' suits. Where the choice is between a windfall to intermediaries or letting guilty defendants go free, liability is imposed. *Hanover Shoe, supra,* 392 U. S. at 494. So, too, between ultimate purchasers and defendants." S. Rep. No. 94–803, p. 44 (1976), quoting 487 F. 2d, at 201 (citation omitted).

Moreover, the possibility of multiple recovery arises in only two situations: (1) where suits by direct and indirect purchasers are pending at the same time but in different courts; and (2) where additional suits are filed after an award of damages based on the same violation in a prior suit.[19] In the first situation, the United States, Brief as *Amicus Curiae* 25, cogently points out that district courts may make use of the alternatives suggested by the Manual for Complex Litigation, 1 (pt. 2) J. Moore, Federal Practice (1976): district courts may use the intradistrict transfer power created by 28 U. S. C. § 1404 (b), coordinate pretrial proceedings of cases pending in

---

[19] If direct and indirect purchasers bring suit in the same court, the cases may be consolidated and damages allocated in accordance with Fed. Rule Civ. Proc. 42 (a). See *West Virginia* v. *Chas. Pfizer & Co.,* 440 F. 2d 1079 (CA2 1971).

different districts, or transfer cases to a single district pursuant to § 1404 (a). In addition, the Judicial Panel on Multidistrict Litigation is empowered by 28 U. S. C. § 1407 to transfer cases involving common questions of fact to any district for coordinated pretrial proceedings upon its determination that the transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." After pretrial transfers under this section, cases can be consolidated and transferred to the same district for trial pursuant to the transfer power under § 1404 (a).[20] A further device mentioned in *Western Liquid Asphalt* is statutory interpleader under 28 U. S. C. § 1335, by which the defendant can bring all potential plaintiffs into the same court and require them to litigate *inter se* to determine their appropriate shares of the total recovery.[21]

True, there is a greater hypothetical danger of multiple recovery where suits are independently instituted after an earlier suit based on the same violation has proceeded to judgment.[22] But even here the likelihood that defendants

---

[20] For a discussion of this process, see Note, The Judicial Panel and the Conduct of Multidistrict Litigation, 87 Harv. L. Rev. 1001 (1974); Comment, The Experience of Transferee Courts Under the Multidistrict Litigation Act, 39 U. Chi. L. Rev. 588 (1972).

[21] Petitioners suggest that interpleader may be an impractical alternative for some defendants, since it requires a defendant to complicate the suit by bringing in ultimate consumers and to post bond for the amount in controversy. See 28 U. S. C. § 1335 (a) (2). Although § 1335 clearly places a burden upon defendants who elect to use it in order to avoid potential multiple liability, that burden is not unique to antitrust cases, and Congress has clearly indicated that it considers the burden justified. See S. Rep. No. 94–803, p. 44 (1976).

[22] The problem of potential multiple recoveries is not present in this case. All suits against petitioners were filed in the Northern District of Illinois. Petitioners never sought consolidation under Fed. Rule Civ. Proc. 42 (a) and stipulated in settlements with direct purchasers that the settlement would not affect the rights of indirect purchasers.

will be subjected to multiple liability is, as a practical matter, remote. The extended nature of antitrust actions, often involving years of discovery, combines with the short four-year statute of limitations to make it impractical for potential plaintiffs to sit on their rights until after entry of judgment in the earlier suit.

The Court today regrettably weakens the effectiveness of the private treble-damages action as a deterrent to antitrust violations by, in most cases, precluding consumers from recovering for antitrust injuries. For in many instances, consumers, although indirect purchasers, bear the brunt of antitrust violations. To deny them an opportunity for recovery is particularly indefensible when direct purchasers, acting as middlemen, and ordinarily reluctant to sue their suppliers,[23] pass on the bulk of their increased costs to consumers farther along the chain of distribution. Congress has given us a clear signal that § 4 is not to be read to have the restrictive

---

[23] The opinion for the Court "recognize[s] that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers," but concludes that "on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." *Ante*, at 746. But the intent of Congress in enacting the *parens patriae* provision of the 1976 Act was clearly to provide a mechanism to permit recovery by consumers, and this purpose is not furthered by a rule that will keep most consumers out of court.

The Court's opinion further observes that "[m]any of the indirect purchasers barred from asserting pass-on claims . . . have such a small stake in the lawsuit that even if they were to recover as part of a class, only a small fraction would be likely to come forward to collect their damages." *Ante*, at 747. Yet it was precisely because of judicially perceived weaknesses in the class action as a device for consumer recovery for antitrust violations that Congress enacted the *parens patriae* provision of the 1976 Act.

scope ascribed to it by the Court today. I would follow the congressional understanding and therefore would affirm.[24]

MR. JUSTICE BLACKMUN, dissenting.

I regard MR. JUSTICE BRENNAN's dissenting opinion as persuasive and convincing, and I join it without hesitation.

I add these few sentences only to say that I think the plaintiffs-respondents in this case, which they now have lost, are the victims of an unhappy chronology. If *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), had not preceded this case, and were it not "on the books," I am positive that the Court today would be affirming, perhaps unanimously, the judgment of the Court of Appeals. The policy behind the Antitrust Acts and all the signs point in that direction, and a conclusion in favor of indirect purchasers who could demonstrate injury would almost be compelled.

But *Hanover Shoe* is on the books, and the Court feels that it must be "consistent" in its application of pass-on. That,

---

[24] Abundant authority sanctions deference to congressional indications in subsequent legislation regarding the congressional meaning in earlier Acts worded consistently with that meaning. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380 (1969); *FHA* v. *The Darlington, Inc.*, 358 U. S. 84, 90 (1958); *United States* v. *Stafoff*, 260 U. S. 477, 480 (1923); *New York & Norfolk R. Co.* v. *Peninsula Exchange*, 240 U. S. 34, 39 (1916). Although it is true, as the Court's opinion states, *ante*, at 734 n. 14, that the post-enactment statements of "particular legislators" who participated in the enactment of a statute cannot change its meaning, see *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 132 (1974), quoting *National Woodwork Manufacturers Assn.* v. *NLRB*, 386 U. S. 612, 639 n. 34 (1967), in this case, the House and Senate Reports accompanying the amendments to § 4 of the Clayton Act clearly reveal the 94th Congress' interpretation of that section as permitting the kind of consumer action which the Court now prohibits. Moreover, it is no answer to this to say that the new *parens patriae* provision will not in all cases directly compensate indirect purchasers, *ante*, at 747 n. 31, for it is clear that despite the difficulty of distributing benefits to such injured persons the new Act authorizes recovery by the State on their behalf.

for me, is a wooden approach, and it is entirely inadequate when considered in the light of the objectives of the Sherman and Clayton Acts. The Hart-Scott-Rodino Antitrust Improvements Act of 1976 tells us all that is needed as to Congress' present understanding of the Acts. Nevertheless, we must now await still another statute which, as the Court acknowledges, *ante,* at 734 n. 14, the Congress may adopt. One regrets that it takes so long and so much repetitious effort to achieve, and have this Court recognize, the obvious congressional aim.