**In re CHICKEN ANTITRUST LITIGATION.**

**Civ. No. C74–2454A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 22, 1980.

See also, D.C., 560 F.Supp. 957 and D.C., 560 F.Supp. 963.

## ORDER

O'KELLEY, District Judge.

In an order dated March 7, 1980, the court approved all the settlement agreements as fair, adequate, and reasonable and then in a second order of August 4, 1980, awarded $3,659,864.63 in fees from the settlement fund to the plaintiffs' attorneys. All that remains to be done at this time is to pass upon the plaintiffs' proposal for distributing the balance of the settlement fund among the five classes certified by the court. Though this plan was drafted in late 1976, this will be the first time that the court has inspected the manner in which the plaintiffs intend to disburse this fund. The interclass sharing proposal outlines the first step in this process: assigning a percentage of the fund to each class. As it stands, the plan divides this initial step into three stages. In the first stage, Class I, which consists of state and local governments and their subdivisions, will receive 9.4% of the settlement fund. Next, Class V, the catch-all class consisting of "other" direct purchasers, will receive a pro rata share of the remaining 90.6% equal to the ratio obtained

by dividing the dollar amount of the claims filed by the members of this class by the dollar amount of claims filed in Classes II–V. The balance of the fund will be allocated among the three remaining classes in accordance with the following percentages: 55.19% will go to Class II, the supermarket class; 17.22% to Class III, consisting of hotels, motels, restaurants, and franchises; and 27.59% to Class IV, the wholesalers. The distribution of these shares among the claimants within each of the five classes will follow proposals to be submitted for the court's review at a later date.

Opposing approval of this plan is a group of sixty direct purchasing claimants [objectors] who, although content with the settlement agreements, are dissatisfied with the sharing proposal. The central premise of their challenge is that the holding in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), bars indirect purchasers, who are among the claimants in Classes I–III, from receiving any share of the settlement fund.[1] The objectors contend that once the indirect purchasers are removed, the classes and their respective shares of the fund bear no reasonable relation to economic realities. They urge that instead the classes and the sharing proposal should be scrapped and that the distribution then be made on the basis of an across-the-board pro rata rationing by dollar amount of purchases. They also complain that this plan puts the court in the position of approving the allocation of the fund among the classes without knowing beforehand how each percentage share will be spread among class members, that it unjustifiably grants preferential treatment to the class

of state and local government entities, and that the distinctions drawn by the proposal among the classes are not supported by credible market data.

Though they challenge the manner in which the plaintiffs propose to distribute the fund, the objectors in effect request the court to reconsider its order of a year ago certifying these classes for the purpose of settlement, in the hope that given a chance to assess the impact of *Illinois Brick* on the indirect purchasers' role in the private enforcement of the antitrust laws, the court will agree that they cannot partake of the settlement fund. Well before *Illinois Brick* was announced and these classes were certified, the court expressed similar concerns on several occasions about the manageability of the putative classes, principally because they contained both direct and indirect purchasers, but when the parties moved to certify these classes for the purposes of settlement, apparently little or no mention was made of the effect of *Illinois Brick* on the indirect purchasers' right to participate equally with the direct purchasers in the distribution of the fund. The court, however, is not inclined to vacate this order now. The court thought at the time that the inclusion of indirect purchasers was correct, and nothing presented by the objectors persuades the court otherwise.

 But before addressing the objectors' contentions, the court feels it wise to first note one peculiar aspect of this discussion. The objectors make several arguments based upon principles of antitrust law, all of which the court feels merit attention here, but the court's consideration

---

1. Since there is no class composed entirely of indirect purchasers, the objectors' argument in one sense is either premature or untimely. To approve the interclass sharing proposal, the court need not determine whether the indirect purchasers secreted within the various classes should receive any of the fund, only whether under the circumstances the share assigned to each class is fair, adequate, and reasonable. Assuming that this plan is approved, the court will have to pass upon the blueprints for distributing this share among each class at some later date. To the extent that this argument ties in with the objectors' other contention that

these shares do not reflect economic realities and should be redrafted, these issues, however, are ripe for decision. Furthermore, the principal complaint of the objectors seems to be that they will not receive what they feel is a large enough share of the fund. Even before the settlement agreements were approved, which the objectors did not oppose, they had some idea of what their return would be if the court approved the settlements and the interclass sharing proposal. If the objectors are disappointed with their expected recovery, perhaps they should have opted out of the settlement and pursued their own remedies.

of these arguments must be placed in the proper perspective. Even though the parties to a lawsuit may agree to settle their differences, they still must have the court's approval before the suit may be terminated, but in reaching this agreement the parties will likely resolve many of the ultimate issues that the court would otherwise have been called upon to decide in accordance with the applicable legal principles. When this settlement agreement is submitted to the court for its review, the court is not authorized to reconsider the compromises proposed by the parties or to reach conclusions on issues of law and fact left unresolved, except to the extent that these understandings or issues bear directly upon the fairness, adequacy, and reasonableness of the proposed settlement.[2] *See Cotton v. Hinton,* 559 F.2d 1326 (5th Cir.1977); *In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D.Ga.1979). The court encourages parties to resolve legal disputes among themselves without judicial intercession, and therefore their agreement will not be disturbed unless after comparing the likely rewards of litigation with the relative disadvantages of settlement, the court is convinced that the terms of the settlement are so unfair, inadequate, and unreasonable that approving it would be an abuse of discretion.

Both the plaintiffs and the objectors agree that the interclass sharing proposal should be measured against this same standard of fairness, adequacy, and reasonableness, and the court sees no reason to disagree. The interclass sharing proposal is essentially a settlement among the plaintiffs entered into to dispose at the outset of one of the single most troublesome issues: how to divide any recovery among the five classes. And like a settlement it is the result of compromise. The purposes of this agreement were basically to avoid interclass bickering, to shore up the plaintiffs' class certification argument, and to show a unified front to the defendants. To agree to these terms each class had to relinquish something in return for what was perceived

as the greater common good. This sharing proposal, then, is in essence an independent settlement agreement between the plaintiffs and should be subject to this same standard of fairness, adequacy, and reasonableness.

■ With this aside in mind, the court turns to the specific contentions of the objectors. The objectors argue that the indirect purchasers should be weeded out of all the classes before the fund is divided. In support of this position they cite one case in which the court redefined the certified class to exclude indirect purchasers after *Illinois Brick* was decided. *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 737 (N.D.Ill.), *appeal dismissed,* 567 F.2d 392 (7th Cir.1977). This modification of the class, however, was undertaken before the cases were settled and, therefore, does not support the objectors' argument that the indirect purchasers should be removed from these settlement classes and denied any recovery from the fund. Nor does the court believe that the holding in *Illinois Brick* otherwise dictates this same result. The Supreme Court concluded in *Illinois Brick* that section 4 of the Clayton Act, 15 U.S.C.A. § 15, which creates a private cause of action for "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . .," grants a remedy to only those individuals who purchased directly from the alleged antitrust violator, even though one who purchased further down the chain of distribution may have absorbed part of the overcharge and was thereby "injured." The Court was concerned that allowing proof that the illegal overcharge had been passed on down the chain to the indirect purchasing plaintiff would frustrate the enforcement of the antitrust laws by further compounding an already complex action. By appointing the direct purchaser in charge of private enforcement of antitrust laws, the Supreme Court, then, selected whom it thought would be the most effec-

---

**2.** The court sees little value in reiterating any further the legal principles discussed in its or-

der of March 7, 1980, when the settlement agreements were approved.

tive plaintiff. In reaching the conclusion that section 4 afforded a remedy for direct purchasers only, the Court, however, did not mean to downplay the significance of the economic injury indirect purchasers sustain when they absorb these overcharges. The Court did not conclude that as a matter of fact indirect purchasers suffer no injury when antitrust laws are violated, only that their injury is not cognizable in a section 4 treble damages suit. Other courts, recognizing this distinction, have held, for the very same reasons that the court feels undercut the objectors' arguments here, that *Illinois Brick* does not bar injunctive relief under section 16 of the Clayton Act to indirect purchasers for the same violations of the antitrust laws. *E.g., In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1167 (5th Cir.1979); *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 594 (3d Cir.1979); *Dart Drug Corp. v. Corning Glass Works,* 480 F.Supp. 1091 (D.Md.1979); *International Association of Machinists and Aerospace Workers v. OPEC,* 477 F.Supp. 553, 564 (C.D.Cal.1979). Entitlement to injunctive relief under section 16 does not depend upon the same proof of economic injury that must support every award of damages in a section 4 suit. Therefore, the apprehensions underlying the Supreme Court's decision in *Illinois Brick* need not trouble a court awarding injunctive relief. A fortiori, these concerns about the complexity of antitrust suits and the search for the ideal plaintiff need not influence the court's approval of the interclass sharing proposal. The plaintiffs readily concede that several of the classes contain ultimate consumers separated from the defendants by several intervening transactions, but this admission is not as damaging as the objectors would have the court believe. Though it does point up a potential problem in distributing the fund fairly among the claimants in each of these affected classes, the presence of indirect purchasers and the decision in *Illinois Brick* alone do not require the court to refuse

approval of the sharing proposal. Under the circumstances it is not unfair or unreasonable per se to allow indirect purchasers to participate in the distribution of the fund.

But even if the court were to conclude that its decision here must be reconciled with the rule announced in *Illinois Brick,* it should be no surprise to the objectors that *Illinois Brick* would still not necessarily stand in the way of the court's approval of this plan, since they agree that a fair, adequate, and reasonable proposal for distributing the fund should pass judicial muster. To blunt the objectors' drive to expel the indirect purchasers, the plaintiffs emphasize the contingencies affecting their efforts to settle these suits and to agree among themselves how any recovery should be shared, all in an effort to demonstrate to the court that their decision to include indirect purchasers is not contrary to law and was in fact the only reasonable response to the predicament they found themselves in when the defendants demanded total peace. Supported by affidavits from individuals familiar with marketing practices in the broiler industry, they contend that at least some of the indirect purchasing class members may qualify under the cost-plus exception to the *Illinois Brick* bar. The objectors submit their own affidavits contradicting the plaintiffs' claim that some broilers are purchased on a cost-plus basis and contend that this exception does not apply here, but these conflicting affidavits do not negative the existence of this issue; they merely demonstrate that an issue exists, one which the court is not authorized to resolve now that the parties have settled.[3] To the same effect is the plaintiffs' contention that the uncertainty surrounding the legislation pending in Congress to overrule *Illinois Brick* supports the decision to include indirect purchasers and the objectors' argument that pending legislation has no bearing on this case. The court does not intend to speculate on the probability of such legisla-

---

**3.** The Fifth Circuit's decision in *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148 (5th Cir.1979), clearly demonstrates, if anything,

that this issue cannot be resolved without a thorough review of the circumstances.

tion passing Congress or on what the consequences of its passage would likely be, but consideration of this contingency by the plaintiffs when drafting this sharing proposal and adjusting the shares to reflect this possibility does not fatally flaw the plan. The real impetus for including the indirect purchasers, even after *Illinois Brick,* however, came from the demands made by the settling defendants. The defendants' objective was to ensure that once these suits were settled, they would not be hauled into court again for their participation in the NBMA conference call program. Given the uncertainty over the applicability of the cost-plus exception and the possibility that *Illinois Brick* would be overruled by statute, the settling defendants had little incentive to object to the presence of indirect purchasers. Nor would it have been reasonable for the direct purchasing plaintiffs to insist on the exclusion of indirect purchasers, since the defendants then would likely refuse to settle on these same favorable terms, and the plaintiffs' chances of prevailing on the merits were not encouraging.

Therefore, while the objectors are correct in saying that before approving the interclass sharing proposal the court must consider the claimants' likely recovery at trial—which means the court must consider the indirect purchasers' probability of recovery after *Illinois Brick*—they are incorrect in concluding that this analysis will lead to the rejection of the indirect purchasers. Under the circumstances it would be impossible for the court to agree that none or only some of the indirect purchasers had any chance of succeeding on the merits without straying beyond the narrowly circumscribed limits placed on the court's authority in assessing the interclass sharing proposal. The objectors do not purport to argue that the indirect purchasers have suffered no economic injury as a result of the NBMA's conference call program; and nor could they without weakening their own claim to a share of the fund, since direct purchasing claimants will no more be required to show that they did not pass on the overcharges than will the indirect purchasers be required to prove that these overcharges were passed on to them. Accordingly, under the circumstances the court concludes that contrary to the objectors' contentions it is not unfair, inadequate, and unreasonable to allow indirect purchasers to share in the distribution of the fund.

■ The remaining arguments of the objectors fall more neatly within the limited scope of the court's inquiry. They first contend that the preferential treatment accorded the class of governmental entities is unwarranted and that the percentage of the fund reserved for this class is not supported by economic data. Pursuant to the plaintiffs' sharing proposal, and on the recommendation of a committee of Assistant Attorney Generals, the members of this class, unlike those belonging to the other four classes, need not submit claims to the Settlement Administration Committee before they receive their portion of the settlement fund. Their share of the fund is 9.4%, which will be set aside before any other class receives its share. According to the plaintiffs, governmental entities were exempted from the claims procedure because, based on experience, the cost of collecting this data from all the various, far-flung governmental subdivisions, entities, and agencies could be expected to exceed their shares of the fund. The objectors contend, though, that if this is the case, then it is also likely that this class consists of a number of indirect purchasers who after *Illinois Brick* are not entitled to participate in the distribution of the fund. Without needlessly reiterating its discussion of the relevance of *Illinois Brick* to the decision at hand, the court disagrees with the objectors that the plaintiffs' decision to excuse the states from this burdensome paperwork lacks any reasonable justification or unfairly discriminates against the private claimants who must prepare written claims to participate. To ensure that it received its fair share of the fund, a state would have to collect information pertaining to all the purchases made during this period by all the state-affiliated organizations, entities, and agencies scattered throughout the state; that this

endeavor would demand excessive investments of time and money is apparent. While this requirement may impose a burden upon larger private claimants whose subsidiaries or divisions may be situated in different regions of the country and may maintain independent business records, the mere fact that the states are excused from this chore does not mar the plaintiffs' proposal; this decision was predicated upon a reasonable assessment of the costs associated with the preparation of these claims and of the probability that without this special exemption the states would quit the settlement negotiations.

▪ For the purposes of this discussion the objectors' additional arguments that the priority given and the percentage of the fund assigned to Class I are not supported by market data can be combined with their broader challenge to the sharing proposal as a whole. Generally speaking, the objectors' contention is that the shares designated by this proposal are not based upon reliable market data but are instead the product of a single afternoon of bargaining among the plaintiffs' representatives, who at the time were concerned more about reaching an expedient solution to a potentially divisive issue than about laying the groundwork for a fair allocation of any recovery among the different classes. They further contend that the plaintiffs have failed to present sufficient evidence of the market conditions existing during the NBMA's existence to substantiate their claim that this proposal is fair, adequate, and reasonable. The plaintiffs concede that the sharing proposal was a fundamental element of their trial strategy. The litigation was composed of a number of suits filed by various types of broiler purchasers, many of whom commenced these actions as representatives of a national class consisting of similarly situated purchasers. The plaintiffs were concerned that squabbling among the classes would reduce their chances of success substantially, whereas by presenting a unified front they could enhance their bargaining position,

guarantee the settling defendants total peace, and perhaps allay the court's concerns about the manageability of these putative national class actions. As it was originally drafted by representatives of each class on November 17, 1976, the plan divided any recovery in accordance with the following percentages:

| Governmental Entities | 15% |
|---|---|
| Supermarkets | 50 |
| Restaurants, Hotels, Motels, Institutional Feeders | 11 |
| Fast Food Establishments | 14 |
| Wholesalers | 10 |

This division was based upon an approximation of the market shares held by each class and of the dollar amount in overcharges that each class likely absorbed during the relevant time period and upon the normal purchasing practices of each class. When *Illinois Brick* was announced, the plan was revamped by request of the representative of the wholesaler class, which consisted largely of direct purchasers, to reflect the elevated status of direct purchasers as follows:

| Class I (Governmental Entities) | 9.4% |
|---|---|
| Class II (Supermarkets) | 50.0 |
| Class III (Restaurants, Hotels, Motels, Institutional Feeders, and Fast Food Establishments) | 15.6 |
| Class IV (Wholesalers) | 25.0 |

Subsequent modifications led to the proposal as it now stands. The class of governmental entities was given priority over the others, and a separate class of direct purchasers was created, Class V, to which the plaintiffs' representatives assigned a share of the fund equal to the ratio their claims in dollars bore to all the claims submitted by the private Classes II–V. The shares allocated to Classes II–IV were then adjusted so that their proportionate recovery under the revised plan would not differ substantially from what they were to receive under the earlier agreement. Refusing even to concede that the sharing proposal ever had strategic utility, the objectors challenge the evidentiary basis for the decisions made by the plaintiffs' representatives.[4] They con-

---

4. The objectors make much of the fact that the sharing proposal was adopted after only three

hours of discussion among the plaintiffs' representatives, apparently inviting the court to in-

tend that the disparity between the shares does not reflect marketplace realities and that what evidence there is supporting the proposal obscures the greater disparity among and uncertainty about the likely recoveries due members of different classes. To emphasize this latter point, the objectors attempt to demonstrate through contrasting mathematical approaches to the same problem of computing each class' share of the fund how a minor twist in the circumstances can alter a class' recovery significantly, and from the objectors' perspective, unreasonably. As the plaintiffs point out, though, this variance is largely attributable to the uneven claims response across the various classes. Because the shares designated by the plaintiffs' plan are based upon factors other than the expected number of claimants or pounds of broilers purchased in each class, it should not be surprising that a heavier response in one class might reduce the return on each pound of chicken purchased by members of this class. This fact alone, however, does not preclude the court's approval of what may otherwise be a valid method of distributing the fund among the classes. To decide that the interclass sharing proposal effects an acceptable division of the fund among the five classes, the court need not know what fraction of the fund every claimant will ultimately receive; it must only conclude that an initial distribution of the fund along the lines proposed by the plaintiffs would be fair, adequate, and reasonable, which brings the court to the objectors' final contention.

The objectors argue that the distinctions drawn among the classes are not supported by any credible economic data. They contend that the NBMA's activities affected all broiler purchasers equally, irrespective of the character of the purchaser's operation, and that therefore the fund should be distributed according to how each claimant's purchases compare to the dollar value of the total purchases by all claimants. While

reiterating that the sharing proposal is essentially a compromise of a difficult issue and therefore not reducible to a precise mathematical formula, the plaintiffs nonetheless argue in their defense that these shares are predicated upon due consideration of the market strength and bargaining power of each class. According to the plaintiffs, the governmental entities class was given priority over the others because the members of this class had more to lose by agreeing to participate in a settlement with private plaintiffs on terms acceptable to both. For one, in addition to federal statutory remedies, most states have enacted legislation under which they could sue antitrust violators ostensibly without regard to federal limitations such as *Illinois Brick*. The ratio used to compute the share for Class V, which was created in response to the defendants' demand for assurances of total peace, was structured so as to ensure that members of this catchall class received, on a weighted average, a share equal to those assigned to Classes II–IV. The percentages of the fund set aside for Classes II–IV were based upon the classes' respective market shares and purchasing practices and the relative likelihood that the classes absorbed or passed on the overcharges. Various studies of the distribution of broilers over several years established market shares for the classes closely corresponding with the shares of the settlement fund they would receive under the plan.

In sum, the court does not agree with the objectors that a sharing proposal ignoring all the contrasting characteristics of the claimants except the dollar amount of their purchases stands alone as the only fair, adequate, and reasonable approach to the difficult chore of distributing the fund among many equally deserving plaintiffs. The shares designated by the plan are the product of good faith bargaining among the plaintiffs' representatives, all of whom were conscious and protective of the inter-

---

fer that the plan is ill-conceived and hastily drafted. But even assuming that this is all the time it took the plaintiffs' representative to agree, the court does not feel that this fact precludes approval of the proposal. No mini-

mum amount of time is required to produce an acceptable plan; the fact that only a little time was invested does not detract from an otherwise acceptable plan.

ests of all the class members. While the plaintiffs' plan is certainly not the only way this fund could be distributed, the court concludes that the interclass sharing proposal is fair, adequate, and reasonable and therefore is hereby approved.