In re VITAMINS ANTITRUST
LITIGATION, This Document
Refers To: All Actions.

Nos. 99–197 TFH, 1285.

United States District Court,
District of Columbia.

Nov. 22, 2000.

### MEMORANDUM OPINION
### Re: Downstream Data

THOMAS F. HOGAN, District Judge.

Pending before the Court are defendants' Rule 53 Objections to the Special Master's Report recommending denial of defendants' Joint Motion to Compel the Production of Documents. After carefully considering the Special Master's Report, the defendants' objections, the plaintiffs' response, the defendants' reply, and the entire record herein, the Court will adopt the Special Master's Report and Recommendations. Specifically, the Court will deny defendants' Motion to the extent that it seeks an order compelling production of downstream data, financial data and exchange rate data[1]. The Court will also grant certain class plaintiffs' Motion for Voluntary Dismissal Without Prejudice and without costs on the condition that these plaintiffs respond to all previously noticed document requests and interrogatories.

### I. BACKGROUND

On May 23, 2000, defendants filed a Joint Motion to Compel the Production of Documents in Response to Certain Defendants' First Consolidated Set of Requests filed December 20, 1999, as modified by the memorandum from Andrew S. Marovitz to all plaintiffs' counsel dated April 10, 2000. Defendants sought to discover: (1) documents regarding plaintiffs' use, manufacture, sale, marketing, distribution or supply of vitamins or vitamin-containing products ("downstream data"); (2) documents regarding plaintiffs' public and nonpublic financial information ("financial data"); (3) documents relating to currency exchange rates as they relate to any purchase, manufacture, sale or distribution of any vitamin product or vitamin-containing product ("exchange rate data"); and (4) documents from each of the 25 plaintiffs named in the Second Consolidated Amended Class Action Complaint rather than merely from the six plaintiffs designated as class representatives.

These issues were referred to the Special Master, who heard oral argument on all four questions on June 22, 2000. In a written Report dated July 28, 2000, the Special Master concluded that, aside from the dispute about discovery from all named plaintiffs as compared to class representatives, the extreme burden of defendants' requests outweighed any "marginal relevance" this material might have; the Special Master thus recommended denial of defendants' Motion to Compel production of downstream, financial, and exchange rate data. The Special Master did, however, recommend granting defendants' Motion to Compel insofar as defendants sought an order requiring production of discovery from all plaintiffs named in the Second Consolidated Amended Class Action Complaint rather than merely from the six plaintiffs designated as class representatives.

### II. STANDARD OF REVIEW

■ Findings of fact in a Special Master's report are reviewed for clear error, while conclusions of law are reviewed de novo. *See D.M.W. Contracting Co. v. Stolz,* 158 F.2d 405, 406–7 (D.C.Cir.1946); *Hartman v. Duf-*

---

1. The Special Master also recommended that the Court grant defendants' Motion insofar as it seeks an order requiring all plaintiffs named in the Second Consolidated Amended Class Action Complaint to respond to defendants' requests for documents. This final recommendation has since been rendered moot by plaintiffs' Motion for Voluntary Dismissal of certain class plaintiffs.

*fey,* 973 F.Supp. 199, 200 (D.D.C.1997); *see also* Fed.R.Civ.P. 53 ("Masters").

In this case, the Special Master's determinations regarding relevance should be reviewed de novo, since the issue of relevance is a legal question. However, the Special Master's burden versus benefit analysis should be reviewed for "clear error" since it involved factual determinations based on affidavits and evidence properly submitted to the Special Master.[2]

## III. DISCUSSION

### A. Downstream Data

■ Defendants seek an order compelling responses to 29 document requests to the extent that those requests describe documents regarding each plaintiff's use, manufacture, sale, marketing, distribution, or supply of vitamins or vitamin-containing products.[3] Defendants argue that they are entitled to this downstream data because it is probative on the issue of damages suffered by direct purchaser plaintiffs.[4] Citing statements of plaintiffs' proposed expert, Dr. John C. Beyer ("Beyer"), defendants assert that individualized plaintiff-by-plaintiff downstream data are relevant to the demand for defendants' vitamin products be-

cause demand is a factor in determining the prices plaintiffs would have been charged "but for" the conspiracy and that the damages recoverable by the direct purchasers will be determined by the difference between the "but for" prices and the prices actually charged pursuant to the conspiracy.

By contrast, plaintiffs cite *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745–46, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), for the proposition that antitrust defendants cannot avoid liability for overcharges on the ground that plaintiffs were able to pass-on any additional costs, and several district court rulings barring discovery of down-stream data as irrelevant given the unavailability of the pass-on defense. In addition, plaintiffs argue that the first Beyer affidavit refers to industry-wide, publicly-available downstream data and that defendants have not established their need for plaintiff-specific information. Finally, plaintiffs claim that defendants' requests for individualized downstream data are "unreasonably burdensome and vexatious" and would "encompass thousands of different products sold by plaintiffs, and literally every document relating to the businesses of the plain-

---

**2.** Because of the importance of these issues and the magnitude of this case, the Court considered whether de novo review of the burden versus benefit analysis would yield a different result. However, even with a de novo review, the Court found no reason for reversal of the Special Master's decision. Therefore, regardless of whether the Special Master's Report is considered de novo or for clear error, the Court would adopt the Special Master's recommendations in this case.

**3.** Alternatively, defendants now say that they will be satisfied with six categories of documents, which amount to approximately 20 requests. *See* Proposed Alternative Order # 2 (attached to Defendant's Renewed Motion to Compel and Objections to Special Master's Report). Plaintiffs argue that this alternate request is merely a "repackaging [of] their demand in summary fashion." Pl's Response at 18. The Court agrees. Although the requests are reworded, the substance of these requests appears to be targeted at essentially the same information as defendants' prior requests.

**4.** Plaintiffs fall into three categories. Seven are "blenders," sixteen are indirect purchasers, and the remaining plaintiffs, approximately 190, are

direct purchasers. *See* Certain Plaintiffs' Joint Response to Defendants' Joint Rule 37 Motion to Compel at 2 n. 2. The direct purchaser plaintiffs are prosecuting claims to recover overcharges paid on vitamin purchases, and counsel for these plaintiffs stipulated at oral argument in front of the Special Master that they are seeking to recover only the overcharge damages on the vitamins purchased directly from the defendants. *See* Special Master's Report at 3 n. 2. The "blender" plaintiffs seek damages for overcharges and for business lost as a result of predatory conduct, and, according to representations made by their counsel before the Special Master, these plaintiffs have agreed to produce documents regarding their use, manufacture, sale, and marketing of vitamin premixes, as well as their financial performance to the extent these documents are relevant to their unique damage claims. *Id.* The indirect purchaser plaintiffs include a small number of direct purchaser plaintiffs who are also pursuing indirect claims under various state laws, and plaintiffs with indirect claims have agreed to produce certain financial documents to the extent that this information is relevant to their claims. *Id.*

tiffs selling those products." *See* Pl's 6/7/00 Mem. at 9. Defendants respond that *Hanover Shoe* and *Illinois Brick* have no applicability to this issue because defendants are not seeking this downstream data in order to assert a pass-on defense. Defendants also contend that plaintiffs have not met their burden of showing how these requests are overly burdensome or oppressive.

Finally, defendants contend that even if they are not entitled to production of downstream data on grounds of its relevance to the determination of but-for prices, they are entitled to production of this data because it is relevant to the amount of overcharges passed on by the direct purchasers to the indirect purchasers, who are also plaintiffs in this case. Defendants argue that consolidation of these cases for pre-trial discovery enables them to discover from one set of plaintiffs facts relevant to claims of another set, particularly when they could obtain the information by treating the direct purchaser plaintiffs as third parties and serving them with Rule 45 subpoenas. Plaintiffs respond that defendants are not entitled to discovery of documents irrelevant to direct purchasers' claims to defend against indirect purchaser claims and that consolidation of these cases for pretrial discovery does not warrant this result. Plaintiffs also contend that defendants have not shown that they could meet the Rule 45 standards for enforcement of third party subpoenas.[5]

Fed.R.Civ.P. 26(b)(1) states that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action", and that "[t]he information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." However, subsection (b)(2)(iii) of this Rule dictates that discovery shall be limited by the Court "if it determines that ... the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in contro-

versy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Therefore, in order to determine whether the individualized downstream data is discoverable, the Court must first determine whether this data is relevant to the subject matter at issue and then if it is deemed relevant, the Court must weigh the benefits of this information to the defendants against the burden or expense that discovery of this information would impose upon plaintiffs.

### 1. *Relevance*

Defendants are correct that *Hanover Shoe* and its progeny do not render irrelevant plaintiffs' individualized downstream data because defendants are not seeking discovery of this data in order to assert a pass-on defense; rather defendants contend that this information is relevant to the determination of consumer demand which, according to Beyer's first affidavit, is a relevant factor in the calculation of "but for" prices that will be determinative of plaintiffs' damages. However, as the Special Master correctly noted, Beyer does not state that individualized, plaintiff-by-plaintiff downstream data is necessary for this determination; rather, he relies on public information to assess the impact of demand on damages. Furthermore, Beyer's second affidavit clearly states: "The reference in my first affidavit to downstream output as a measure of demand was to overall market demand." Beyer 7/3/00 Aff. ¶ 5. Therefore, Beyer's affidavits do not establish the relevance of this individualized downstream data.

After concluding that Beyer's affidavits do not establish relevance, the Court must now consider the competing statements of economists Professor William Landes ("Landes") and Dr. Hal Sider ("Sider") on one side and Dr. James Langenfeld ("Langenfeld") on the other. Landes and Sider state that economically reliable estimates of "but for" prices

---

**5.** To support this argument, plaintiffs cite the *Manual for Complex Litigation, Third* § 21.447 at 81–82 (1995) (a party seeking production under Rule 45 "has a duty to take reasonable steps to avoid imposing undue burden or expense on the person subpoenaed" and "before resort to subpoenas" the party should consider "the possibility of acquiring the needed information ... from other sources").

can be made using publicly available data and sales data that defendants are now producing and that individualized plaintiff-by-plaintiff downstream data "are not required to develop reliable plaintiff-specific estimates of 'but for' prices and damages." Landes & Sider Decl. ¶¶ 11, 15. By contrast, Langenfeld notes that individualized downstream data "could be useful" and "may be helpful" in determining "but for" prices and says that it is premature and inappropriate at this stage of the development of the record to conclude otherwise. Langenfeld Aff. ¶¶ 8, 10, 11. Langenfeld explains that "[p]laintiffs likely have very informative studies, reports, and analyses about their particular market segments and that this information may be more reliable and useful for estimating the 'but for' prices than third-party industry data." *Id.* Langenfeld also notes that Landes and Sider admit that they "have not yet developed a specific framework for analyzing damages in this case." Langenfeld Aff. ¶ 16.

While it is worth noting that the record contains no response to the statements of Langenfeld, the language of his affidavit is not wholly unequivocal and he gives no reason why damages could not be calculated through the industry-wide public data which Landes and Sider claim would be sufficient. Moreover, the fact that Landes and Sider have not yet developed the exact model upon which to measure damages in this case does not make their opinions about the relevance of individualized downstream data any less credible. It is likely that few, if any, experts have already developed damage models for this case. In addition, Landes and Sider did explain in detail in their declaration that standard statistical techniques such as regression analysis are routinely used to estimate the relationship between price and factors such as customer volume of purchases, location, or bargaining ability so as to permit

the accurate calculation of "but for" prices that each customer would have paid in the absence of the conspiracy; they also made reference to specific litigation in which such damage studies have been used. Landes & Sider Decl. ¶¶ 11–15.

As noted by the Special Master, there is no applicable caselaw holding that this individualized downstream data is producible. There is, however, one unreported district court decision, *In re Folding Carton Antitrust Litigation,* No. MDL 250 (N.D.Ill. May 5, 1978), rejecting arguments similar to those advanced by defendants in this case and denying production of downstream data.[6] In that case, defendants asserted that the requested financial data "relates to the issues of impact [of the violation] and damages" and are "relevant to determine whether large and prosperous purchasers of folding cartons exercised 'countervailing power' to prevent prices of folding cartons from rising to improperly high levels." *Id.* at 6. The district court rejected the defendants' justifications for production of plaintiffs' downstream financial data. Specifically, the court held that:

> We agree with plaintiffs that whether the profitability of purchasers' operations using folding cartons increased by more than the standard price indices is irrelevant to the subject matter of this litigation. If there was an overcharge, its amount can be determined by looking at the price movement of folding cartons and not the profit picture of various folding carton purchasers. If plaintiffs are entitled to recover for an overcharge, they will do so regardless of whether their profits decreased or increased during the period of the conspiracy. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Whether purchasers absorbed, passed-on, or made a profit on the overcharges in

---

**6.** In their response to defendants' objections to the Special Master's Report, plaintiffs also cite *In re Wirebound Boxes Antitrust Litigation,* 131 F.R.D. 578 (D.Minn.1990) (holding "that plaintiffs' financial information is not relevant to any outstanding issue in this litigation") and *In re Carbon Dioxide Industry Antitrust Litigation,* 155 F.R.D. 209 (M.D.Fla.1993) (holding that plaintiffs' "cost and profits" was irrelevant and reject-

ing defendants' argument that they were entitled to compare plaintiffs' profitability to their own). Although the holdings of these cases appear to support plaintiffs' position, the decisions themselves offer no analysis or reasoning for these holdings so it is difficult to ascertain whether they are in fact comparable to the Vitamins litigation.

comparison with the industry generally is irrelevant, and investigations into such matters are proscribed by *Illinois Brick*.

*Id.* at 7–8. Although defendants acknowledge that the discovery dispute in *Folding Carton* tracks our case almost exactly, they attempt to distinguish this case by noting that the *Folding Carton* court expressly reserved opinion on whether defendants are entitled to discover all plaintiffs' financial information in the event that some plaintiffs assert claims for consequential damages rather than solely damages derived from overcharges. Plaintiffs do not respond to this argument; however, the fact remains that no court has ever allowed production of individualized downstream data and certainly there are other antitrust cases in which direct and indirect purchasers were named together as parties to the litigation. Therefore, the proposition that there are indirect purchasers in this case who may assert claims for damages other than direct overcharges is not sufficient to carry defendants' burden of showing that this information ought to be produced by the direct purchasers.

Finally, defendants contend that this data is necessary to show plaintiffs' demand elasticity which defendants say is necessary to show their leverage vis-a-vis particular plaintiffs and therefore would assist them in determining the prices that they would have been able to charge each plaintiff in the absence of the conspiracy. Although this argument was not explicitly raised in front of the Special Master and therefore is not directly addressed in his Report, this Court agrees with plaintiffs that defendant's "price discrimination" argument is essentially equivalent to the "countervailing power" argument rejected in *Folding Carton:*

> We do not find defendants' "countervailing power" argument persuasive. The defense that plaintiffs' economic power could have kept the prices of folding cartons down is irrelevant where, as here, the crucial issue is whether there was a conspiracy to fix prices. To suggest that a conspiracy was not as successful as it might otherwise have been because of the plaintiffs' countervailing economic power is absurd. Such

an alleged "economic check" is of no consequence in a price fixing case.

> Whether certain buyers made profits is irrelevant to the question of whether those buyers actually paid higher prices as a result of the alleged conspiracy to fix prices. Moreover, buyers' leverage is not determined by profits, but by volume of purchases.

*Id.* at 3–4. Furthermore, as Landes and Sider noted, "[i]n a competitive industry, the price paid by an individual customer does not depend on the value the customer attaches to the good. Instead, price depends simply on costs and aggregate demand.... There is no reason to expect that, in the absence of the conspiracy, defendants could successfully engage in price discrimination based on each individual plaintiff's circumstances in the manner suggested by defendants." Landes & Sider Decl. ¶¶ 20–21. Finally, the Court agrees with plaintiffs that if defendants are able to price discriminate in the absence of the conspiracy, as they now allege, they must already have in their possession the information necessary to measure individualized demand elasticities if such information is vital to these alleged price discrimination practices. Therefore, the Court finds defendants' price discrimination argument for production of individualized downstream data unconvincing.

In summary, the Court agrees with the Special Master that the record establishes only marginally, if at all, the relevance and possible benefits of this individualized downstream data.

### 2. Benefits v. Burden

The next question, assuming that the individualized downstream data is at least marginally relevant, is whether the benefit to defendants of having this data available exceeds the burden to plaintiffs of producing this information. After reviewing the entire record in this case, the Court is satisfied that compelling production of individualized downstream data in response to defendants' 29 requests would impose an undue burden on plaintiffs and that this burden outweighs any potential benefit defendants might yield from this data.

In weighing the benefits and burdens of the proposed discovery, the Court must consider (1) the needs of this case, (2) the amount in controversy, (3) the parties' resources, (4) the importance of the issues at stake in the litigation, and (5) the importance of the proposed discovery in resolving the issues. Fed.R.Civ.P. 26(b)(2)(iii). Defendants claim that the Special Master failed to consider these factors in making his decision. However, the fact that the Special Master did not explicitly detail his thought process on each of the above-mentioned factors does not show that he failed to take them into account.

The Special Master's analysis of the marginal relevance and questionable benefits of this proposed discovery as compared to the major issues in this case and the need to advance this litigation rather than allow it to be stalled by overly broad and unduly burdensome discovery suggests that he did consider each of these factors. In fact, the fifth factor—the importance of the proposed discovery in resolving the issues in this case—appears to have driven his analysis. Specifically, the Special Master concluded that individualized downstream data was only marginally relevant to this lawsuit and that, given the size and complexity of this suit and the amount of resources that even highly relevant discovery would entail, the fact that this data was of questionable benefit in resolving any of the issues in this case tilted the balance against compelling production. Therefore, the Court finds that the Special Master correctly considered all relevant factors in making the determination of undue burden under Rule 26(b)(2)(iii). Since the Court finds no clear error in the Special Master's findings or conclusions and since the Court, even considering the matter de novo, would reach the same conclusion, the Court will adopt the Special Master's recommendation and deny defendants' Motion to Compel production of downstream data.[7]

## B. Financial Data

■ Defendants argued for production of plaintiffs' financial data on the same grounds as for downstream data—relevance to demand and calculation of "but for" prices of vitamins and reference to financial data in Beyer's affidavit. Although defendants did not explicitly state any objection to this section of the Special Master's report in their opposition brief or at oral argument and may therefore be found to have conceded this issue, the Court must nevertheless review the Special Master's findings in this area in order to decide whether or not it should adopt the Special Master's decision with respect to financial data.

The Court agrees with the Special Master that none of the three decisions cited by defendants, *Audiotext Communications Connections USA, Inc. v. Telecom, Inc.*, No. 94–2395–GTV, 1995 WL 18759 (D.Kan. Jan. 17, 1995), *Audiotext Communications Network, Inc. v. Telecom, Inc.*, No. 94–2395–GTV, 1995 WL 625962 (D.Kan. Oct.5, 1995), and *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 430 (N.D.Ill.1977), are helpful to defendants' case. The *Audiotext* court denied most of defendants' requests for financial data and severely limited the scope of another such request; however, *Audiotext* was not an antitrust case and the limited production ordered by that court was found to be relevant to a counterclaim for punitive damages and potentially relevant to a claim for lost profits. Since these claims are not present in the Vitamins litigation, the *Audiotext* cases appear to be inapposite. Moreover, the *Folding Carton* court explicitly held that defendants were not entitled to production of plaintiffs' financial data on grounds of the relevance of such data to the impact of the violation and to damages. Therefore, *Folding Carton* provides no support for defendants' position.

Accordingly, after considering the applicable law and the entire record in this case, the Court will adopt the Special Master's recommendation and deny defendants' Motion to

---

7. In accordance with this ruling, the Court will grant class plaintiffs' Motion for a Protective Order under Fed.R.Civ.P. 26(c) concerning the scope of class plaintiffs' depositions noticed by defendants under Rule 30(b)(6).

Compel production of plaintiffs' financial data described in Requests No. 5 and 6.

## C. Exchange Rate Data

█ Defendants also moved to compel production by plaintiffs of documents relating to currency exchange rates, particularly as they may have affected the prices of plaintiffs' vitamin-containing products. Again, defendants noted no specific objection to this portion of the Special Master's report in their opposition brief; however, the Court reviewed the Special Master's Report on this issue in order to decide whether or not to adopt the Special Master's recommendation that the Court deny defendants' Motion to Compel exchange rate data.

Defendants devote only one paragraph to this argument and cite no cases. The grounds asserted appear to be the same as those offered to support their claim to production of downstream data—the first Beyer affidavit and relevance to damages calculations. However, as the Special Master points out, the Beyer affidavit does not state that plaintiff-specific data regarding the impact of exchange rates is necessary for the "but for" price calculation. Moreover, defendants' proposed expert does not contend that discovery of this data is necessary; in fact, Langenfeld merely states that "as an economist, I would be interested in knowing about other factors and practices that influence the pricing of the downstream products, such as how plaintiffs account for exchange rates in their pricing." Langenfeld Aff. at 16 n. 16. Furthermore, the Special Master notes that exchange rates during the relevant time period are publicly available and that plaintiffs have agreed to produce any documents regarding the impact of exchange rates on the prices they paid for vitamins that they purchased. Defendants have not shown that

more is necessary. Therefore, the Court agrees with the Special Master's recommendation and accordingly will deny defendants' Motion to Compel production of plaintiffs' exchange rate data.

## D. Voluntary Dismissal of Certain Class Plaintiffs

Before the Special Master, nonsettling defendants sought an order compelling each of the 25 companies and individuals named as plaintiffs in the Second Consolidated Amended Class Action Complaint to respond to the document requests. In support of their position, defendants cited *In re Folding Carton Antitrust Litigation*, 83 F.R.D. 260, 264 (N.D.Ill.1979) ("Plaintiffs bringing actions will not be allowed to self-select the active class representatives and then leave discovery limited to the portion the plaintiffs selected"). The class plaintiffs argued that discovery should be limited to the six plaintiffs designated as class representatives and that the other 19 should be treated as absent or passive class members who are not generally subject to discovery. To support this proposition, they cited *In re Carbon Dioxide Antitrust Litigation*, 155 F.R.D. 209 (treating non-class representatives as passive class members for purposes of discovery). After reviewing all applicable briefs and after hearing oral argument on this issue on June 22, 2000, the Special Master recommended that all named class plaintiffs be ordered to respond to defendants' document requests. Plaintiffs filed no objections to the Special Master's Report. However, before the Court was able to rule on this issue, certain class plaintiffs filed a Motion for Voluntary Dismissal of their Actions without prejudice and without costs.[8] Defendants EM Industries, Inc., Merck KgaA, and E. Merck have since filed objections to this Motion.[9]

8. This Motion was inadvertently granted by the Court before the time to file oppositions had run. Therefore, the Order granting this Motion is vacated and the objections are deemed timely filed.

9. EM Industries, Inc. properly filed a memorandum of law in opposition to the class plaintiffs' Motion on September 7, 2000. On September 20, 2000, defendants Merck KgaA, E. Merck, and EM Industries filed a "supplemental memorandum" in opposition to the class plaintiffs' Mo-

tion. This supplemental memorandum cites no newly discovered facts or changes in the law that would necessitate the need for this extra document, nor do these defendants petition for leave to file this supplemental brief. The Court reminds defendants of its insistence that all counsel follow the local rules of this Court and avoid unnecessary and unwarranted supplemental filings in this case.

Fed.R.Civ.P. 41(a)(2) allows the Court, in its discretion, to dismiss at any time an action without prejudice upon a motion by the plaintiff and subject to "such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(2); *see also Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley, et al.*, 178 F.R.D. 328, 331 (D.D.C.1998). In federal practice, voluntary dismissals sought in good faith are generally granted "unless the defendant would suffer prejudice other than the prospect of a second lawsuit or some tactical advantage." *Conafay v. Wyeth Labs.*, 793 F.2d 350, 353 (D.C.Cir.1986). Thus, prior to dismissing certain class plaintiffs from this action, the Court must determine: (1) whether plaintiffs' motion for voluntary dismissal was sought in good faith; and (2) whether the defendants would suffer "legal prejudice" from a dismissal at this stage in the litigation.

First, the Court finds plaintiffs' "good faith" in filing this Motion to be highly questionable. It is unclear why plaintiffs waited until the last moment, after the Special Master had already ruled against them, to file this Motion. Plaintiffs discuss no new circumstances or changes in the litigation to necessitate a voluntary dismissal at this point. Moreover, plaintiffs do not sufficiently explain their need for a voluntary dismissal at this stage in the process. Although they argue that they can be adequately represented by the class representatives and therefore that it would be most efficient to have them proceed as non-party members of the putative litigation classes rather than as named party plaintiffs, they offer no explanation of why they could not always have been adequately represented by the class representatives and why it would necessarily be more efficient for the Court to dismiss these plaintiffs at this time. In fact, it seems fairly obvious that these plaintiffs wish to dismiss their actions merely to avoid having to give defendants the discovery authorized by the Special Master's Report. Therefore, the Court finds the timing of plaintiffs' Motion suspect and somewhat indicative of bad faith.

However, although the timing of plaintiffs' Motion does appear suspect, this alone would not warrant a denial of their Motion; the Court must also determine whether defendants would suffer legal preju-

dice by a voluntary dismissal of certain class plaintiffs at this time. *See Eaddy v. Little*, 234 F.Supp. 377, 379 (E.D.S.C.1964) ("A plaintiff generally has the right to a voluntary dismissal, upon the payment of defendant's costs, unless it appears that the defendant would suffer from plain legal prejudice other than the mere prospect of a second lawsuit"). In determining whether a defendant would suffer legal prejudice by a voluntary dismissal of certain plaintiffs, the Court must consider: (1) the defendants' effort and expense for preparation of trial; (2) excessive delay or lack of diligence on the plaintiffs' part in prosecuting the action; (3) the adequacy of plaintiffs' explanation of the need for dismissal; and (4) the stage of the litigation at the time the motion to dismiss is made, specifically whether a motion for summary judgment is pending. *See Federal Deposit Insurance Corp. v. Knostman*, 966 F.2d 1133, 1142 (7th Cir.1992); *see also Piedmont Resolution*, 178 F.R.D. at 331.

### 1. *Defendants' Effort and Expense*

In this case, if the Court grants the Motion for Voluntary Dismissal, the only potential wasted effort or expense would be any work done by defendants to prepare for depositions of the moving plaintiffs or to draft document requests or interrogatories directed at these plaintiffs. Presumably, most of this work would still have been necessary since some plaintiffs, i.e. the class representatives, are still pursuing this litigation. *See McLaughlin v. Cheshire*, 676 F.2d 855, 857 (D.C.Cir.1982) ("where a plaintiff seeks voluntary dismissal in one forum to pursue pending litigation against the defendant in another forum, the defendant is not entitled to reimbursement for expenses incurred in preparing work product that has been or will be useful in the continuing litigation"). However, to the extent that defendants can show unnecessary expenses, the proper remedy for such wasted expenditures would be reimbursement of costs rather than a denial of voluntary dismissal. *See Piedmont Resolution*, 178 F.R.D. at 331–32 ("Although the fact that the defendants may have incurred substantial expense prior to the dismissal does not amount to legal prejudice, "[t]he burdens of relitigation are appropriately cured by conditioning dismissal on the pay-

ment of costs for work and effort incurred in the first case that would not be of use in the second" "). Therefore, the defendants' effort and expense would not be sufficient to require a denial of plaintiffs' Motion for Voluntary Dismissal in this case.

### 2. Plaintiffs' Lack of Diligence/Unnecessary Delay

The Court finds that plaintiffs have shown a lack of diligence and a possible unnecessary delay in bringing this Motion. The parties would have been better served had this issue been raised in front of the Special Master before he ruled on defendants' request for discovery of all 25 named plaintiffs. Nevertheless, the Court cannot find that plaintiffs have demonstrated excessive delay and lack of diligence in prosecuting this action as a whole. Therefore, the Court cannot find this factor to be dispositive in this case.

### 3. Adequacy of Plaintiffs' Need for Dismissal

The Court is not convinced by plaintiffs' explanation of their need for dismissal at this point. Aside from their general concerns with efficiency and the fact that their interests can apparently be adequately represented by the class representatives, plaintiffs have offered no rationale for a voluntary dismissal. Certainly, it does not appear that such a dismissal is necessary, nor is there any proof that proceeding through the class representatives would automatically result in greater efficiency. In fact, this Court agrees with defendants that plaintiffs' Motion appears motivated by a desire to avoid the Special Master's recommendation that all named class plaintiffs be compelled to submit to discovery. Therefore, this Court finds plaintiffs' explanation of their need for dismissal to be largely inadequate. See Teck General Partnership v. Crown Central Petroleum Corp., 28 F.Supp.2d 989 (E.D.Va. 1998) (holding that a plaintiff may not voluntarily dismiss without prejudice as a way of avoiding an adverse ruling).

However, the fact that plaintiffs do not present a compelling reason for dismissal

would not concern the Court if such a dismissal caused no prejudice to defendants. Defendants argue that dismissal would prejudice their rights as to the production of certain documents and the taking of discovery from these plaintiffs. Clearly, legal prejudice would result if dismissal of certain plaintiffs would render the defendants unable to conduct sufficient discovery to adequately defend themselves against the charges in this case. See Piedmont Resolution, 178 F.R.D. 328 at 331 (adopting the Ninth Circuit's definition of legal prejudice as "when the dismissal of a party would have rendered the remaining parties unable to conduct sufficient discovery to untangle complex fraud claims and adequately defend themselves against charges of fraud"). The Court therefore finds it proper for protection of defendants that the production of all documents and the answering of all interrogatories already noticed by defendants be a prerequisite to a voluntary dismissal without prejudice and without costs; under such circumstances defendant can lose no substantial right by the dismissal.[10] See Eaddy, 234 F.Supp. at 380 (conditioning voluntary dismissal on plaintiff's production of certain documents previously noticed).

### 4. Stage of the Litigation

Although the Court believes that plaintiffs should have brought this Motion earlier, the fact remains that the Motion for Voluntary Dismissal was filed at a relatively early stage in this litigation. Most denials of voluntary dismissals are justified by the fact that defendants had already filed motions for summary judgment or that the parties were on the eve of trial. See, e.g., Pace v. Southern Express Co., 409 F.2d 331, 334 (7th Cir.1969) ("The defendant's objections to plaintiff's motion to dismiss disclosed that the case had already been pending for one and one-half years, that considerable discovery had been undertaken at substantial cost to the defendant, and that defendant had already briefed its motion for summary judgment"). In this case, although this action has been pending

---

**10.** The Court will not require these plaintiffs to appear for depositions already noticed, however, since they will not be named parties to this litigation at the time of trial and since the Court finds that responses to document requests and interrogatories will sufficiently cure any prejudice suffered by defendants from the withdrawal of these plaintiffs as named parties.

for over a year, the parties are still in the early stages of discovery. Moreover, there are no motions for summary judgment pending and the parties are over a year-and-a-half away from their expected trial date. *See Conafay*, 793 F.2d at 352 (noting that appellants filed their motion to dismiss at a "relatively early stage of the litigation," i.e. "three months before the District Court's deadline for completion of discovery"). Therefore, this Court cannot find that plaintiffs' Motion comes at too late a stage in the litigation. Accordingly, the Court will grant certain plaintiffs' Motion for Voluntary Dismissal Without Prejudice and Without Costs on the condition that they respond to all previously noticed document requests and interrogatories.[11]

### IV. CONCLUSION

For the foregoing reasons, the Court will adopt the Special Master's recommendation to deny Defendants' Joint Motion to Compel production of individualized downstream data, financial data, and exchange rate data. In addition, the Court will grant certain plaintiffs' Motion for Voluntary Dismissal, on the condition that these plaintiffs respond to all document requests and interrogatories previously noticed.

---

**11.** These plaintiffs, of course, have a choice of accepting this condition, or withdrawing their dismissal motion and proceeding as named parties to the class litigation.